IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

DAN MILLER, as Special Administrator of the )
ESTATE OF HANK MILLER, Deceased, )
TAMMY SCOTT, an individual, )
)
                   Plaintiffs, )
)
v. )    Case No. CIV-22-164-RAW
)
B. J. HEDGECOCK, in his official capacity as )
Sheriff of Pushmataha County, State of Oklahoma, )
*et al.*, )
)
                 Defendants. )

---

## DEFENDANT B.J. HEDGECOCK'S
## MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

---

Wellon B. Poe, OBA No. 12440
Jamison C. Whitson, OBA No. 18490
COLLINS ZORN & WAGNER, PLLC
429 N.E. 50th Street, Second Floor
Oklahoma City, OK 73105
Telephone:    (405) 524-2070
Facsimile:    (405) 524-2078
E-mail:      wbp@czwlaw.com
              jcw@czwlaw.com

***ATTORNEYS FOR DEFENDANT B.J.
HEDGECOCK***

December 16, 2024

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ......................................................................................... ii-iv

LIST OF EXHIBITS ........................................................................................................ v-vi

LCvR 56.1(b) STATEMENT ............................................................................................ 1

STANDARD OF REVIEW FOR SUMMARY JUDGMENT ........................................ 8

I.      THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT WITH
REGARD TO PLAINTIFFS' 42 U.S.C. § 1983 CLAIMS ................................................ 8

      A.    Custom, Policy, or Practice..................................................................... 9

      B.    Hiring .................................................................................................... 11

      C.    Training.................................................................................................. 12

      D.    Supervision ........................................................................................... 15

II.     THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT WITH
REGARD TO PLAINTIFFS' STATE LAW TORT CLAIMS ......................................... 16

      A.    Plaintiff Miller's Wrongful Death/Excessive Force Claims.................. 16

      B.    Plaintiff Scott's Excessive Force Claim ................................................ 17

      C.    Plaintiffs' Claims of Negligent Hiring, Training, and Supervision ....... 18

CONCLUSION................................................................................................................. 18

CERTIFICATE OF SERVICE ................................................................................... 19-20

# **TABLE OF AUTHORITIES**

## **CASES**

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998) ....................................................... 8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 8

*Barney v. Pulsipher*, 143 F.3d 1299 (10th Cir. 1998) ................................................................. 13

*Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397
   (1997) ........................................................................................................................... 9, 15

*Board of County Commissioners v. Brown*, 520 U.S. 397 (1997) ......................................... 11, 12

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175 (10th Cir. 2010) ........................ 9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................ 8

*City of Canton v. Harris*, 489 U.S. 378 (1989) ............................................................... 12, 13, 15

*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) .............................................................. 9, 12

*Conaway v. Smith*, 853 F.2d 789 (10th Cir. 1988) ...................................................................... 8

*Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994) ......................................... 8

*Connick v. Thompson*, 563 U.S. 51 (2011) ........................................................................... 12, 15

*Econ. Fire & Cas. Co. v. Faulkner*, 790 F. Supp. 1082 (W.D. Okla. 1991) *aff'd*, 951 F.2d 1258
   (10th Cir. 1991) ................................................................................................................. 16

*Fuller v. Odom*, 741 P.2d 449 (Okla. 1987) ............................................................................. 16

*Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991) ....................................................................... 8

*Jones v. Hacker*, 2015 WL 1279357 (E.D. Okla. Mar. 20, 2015) (unpub) ................................... 10

*Jones v. Hacker*, 2015 WL 1279363 (E.D. Okla. Mar. 20, 2015) (unpub) ................................... 14

*Jordan v. Cates*, 935 P.2d 289 (Okla. 1997) ........................................................................... 18

*Keith v. Koerner*, 843 F.3d 833 (10th Cir. 2016) ................................................................. 13, 15

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015) ........................................................................ 18

*Lankford v. City of Hobart*, 73 F.3d 283 (10th Cir. 1996) ......................................................... 10

*McClelland v. Facteau*, 610 F.2d 693 (10th Cir. 1979) ................................................................ 16

*Mitchell v. Maynard*, 80 F.3d 1433 (10th Cir. 1996) ................................................................... 15

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) ................................ 9, 12

*Morales v. City of Okla. City*, 230 P.3d 869 (Okla. 2010) ............................................................ 17

*Murphy v. Bitsoih*, 320 F. Supp. 2d 1174 (D.N.M. 2004) ............................................................ 10

*Pembaur v. Cincinnati*, 475 U.S. 469 (1986) ................................................................................. 9

*Quintana v. Santa Fe Cty. Bd. of Commissioners*, 973 F.3d 1022 (10th Cir. 2020) ............. 13, 15

*Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464 (D. Colo. 1996) ......................................... 8

*Salazar v. City of Oklahoma City*, 976 P.2d 1056 (Okla. 1999) ................................................. 16

*Schovanec v. Archdiocese of Oklahoma City*, 188 P.3d 158 (Okla. 2008) .................................. 12

*Scott v. Mid-Del Schools Board of Education*, 229 F.Supp.3d 1254 (W.D. Okla. 2017),
    *aff'd*, 724 Fed.Appx. 650 (10th Cir. 2018) (unpub) ................................................................. 18

*Waller v. City & Cty. of Denver*, 932 F.3d 1277 (10th Cir. 2019) ............................................... 15

*Wright v. Rasmussen*, 2018 WL 4832356 (E.D. Okla. Oct. 4, 2018) ......................................... 15

*Young v. Oklahoma City Pub. Sch., Indep. Sch. Dist. 89*, 2013 WL 6567144
    (W.D. Okla. Dec. 13, 2013) (unpub) ....................................................................................... 18

## FEDERAL STATUTES AND RULES

42 U.S.C. § 1983 ...................................................................................................... 8, 9, 10, 11, 12

Fed. R. Civ. P. 56(a) ................................................................................................................ 1, 8

## OKLAHOMA STATUTES

Okla. Stat. tit. 51, §§ 151, *et seq.* ................................................................................................ 16

Okla. Stat. tit. 51, § 152.1(A) ...................................................................................................... 16

Okla. Stat. tit. 51, § 152(14) ........................................................................................................ 16

Okla. Stat. tit. 51, § 153 ................................................................................................ 16

Okla. Stat. tit. 51, § 153(A) ..................................................................................... 16, 18

Okla. Stat. tit. 51, § 155(5)............................................................................................ 18

## **LOCAL RULES**

LCvR 56.1(b) ..................................................................................................................... 1

## LIST OF EXHIBITS

Exhibit 1  –  Declaration of Keith Knoll

Exhibit 2  –  Excerpt of Deposition of Keith Knoll

Exhibit 3  –  Body Cam Video of Keith Knoll **(to be filed conventionally)**

Exhibit 4  –  Excerpt of Deposition of Brian Columbus

Exhibit 5  –  Audio of OSBI interview of Tammy Scott **(to be filed conventionally and under seal with Court's approval)**

Exhibit 6  –  Excerpt of Deposition of Glenn Walp

Exhibit 7  –  Excerpt of Deposition of Tammy Scott

Exhibit 8  –  Antlers Fire and EMS Record for Brian Columbus **(to be filed under seal with Court's approval)**

Exhibit 9  –  Body Cam Video of Tim Steely **(to be filed conventionally)**

Exhibit 10 – Excerpt of Deposition of Tim Steely

Exhibit 11 – Antlers Fire and EMS Record for Hank Miller **(to be filed under seal with Court's approval)**

Exhibit 12 – Use of Force Policy **(to be filed under seal with Court's approval)**

Exhibit 13 – Pursuits Policy **(to be filed under seal with Court's approval)**

Exhibit 14 – Excerpt of Deposition of Dustin Bray

Exhibit 15 – Excerpt of Deposition of Sheriff B.J. Hedgecock

Exhibit 16 – Drug and Alcohol Testing Policy **(to be filed under seal with Court's approval)**

Exhibit 17 – Declaration of Sheriff B.J. Hedgecock

Exhibit 18 – Results of Controlled Substance Test dated May 4, 2021of Keith Knoll **(to be filed under seal with Court's approval)**

Exhibit 19 – Tim Steely Notification of Employment/Termination

Exhibit 20 – Tim Steely CLEET Profile

Exhibit 21 – Tim Steely CLEET Certificate

Exhibit 22 – Brian Columbus Notification of Employment/Termination

Exhibit 23 – Brian Columbus CLEET Profile

Exhibit 24 – Keith Knoll Notification of Employment/Termination

Exhibit 25 – Keith Knoll TCOLE Licensure

Exhibit 26 – Keith Knoll TCOLE Profile

Exhibit 27 – Licensee Psychological and Emotional Health Declaration of Keith Knoll **(to be filed under seal with Court's approval)**

Exhibit 28 – Notification of Psychological Evaluation for Peace Officers of Keith Knoll **(to be filed under seal with Court's approval)**

Exhibit 29 – District Attorney letter dated July 10, 2021

Exhibit 30 – Medical Examiner's Report of Laboratory Analysis

Exhibit 31 – CLEET Course No. 21-1897

Exhibit 32 – Unpublished Order and Opinion in *Jones v. Hacker*

Exhibit 33 – Unpublished Order and Opinion in *Jones v. Hacker*

Exhibit 34 – Unpublished Opinion and Order in *Wright v. Rasmussen*

Exhibit 35 – Unpublished Order and Judgment in *Scott v. Mid-Del Schools Board of Education*

Exhibit 36 – Unpublished Order in *Young v. Oklahoma City Pub. Sch., Indep. Sch. Dist. 89*

**DEFENDANT HEDGECOCK'S MOTION FOR**
**SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Defendant B.J. Hedgecock, in his official capacity as Sheriff of Pushmataha County, State of Oklahoma, ("Defendant") moves the Court to grant summary judgment in his favor pursuant to Federal Rule of Civil Procedure 56(a) with regard to Plaintiffs' claims against him. In support thereof, Defendant submits the following Brief:

**LCvR 56.1(b) STATEMENT**

1.      On May 30, 2021, Pushmataha County Sheriff's Office ("PCSO") Deputies Keith Knoll and Brian Columbus were riding together during the night shift, stationed outside of the Choctaw Travel Plaza and Casino in Antlers, Oklahoma around 2:00 a.m. (Ex. 1, Declaration of K. Knoll, ¶ 2).

2.      The Deputies followed a vehicle leaving the Travel Plaza, Knoll noticed that the vehicle, a white Chevy Cobalt, had an obscured license plate, which is a traffic offense under Oklahoma law. Accordingly, Knoll pulled over the vehicle and began speaking with the driver, Hank Miller. A woman named Tammy Scott was also in the vehicle with Mr. Miller. (Ex. 1, Declaration of K. Knoll, ¶¶ 2, 4; Ex. 2, Knoll Depo. p. 104:6-15; p. 135:21-25, Ex. 3, Body Cam Video (BCV) of Knoll); Okla. Stat. tit. 47, § 1113(A)(4).

3.      During the course of this conversation, Miller stated that he did not have a driver's license, as it was under suspension at the time. He also stated it was suspended for possession of drugs in his vehicle. (Ex. 1, Declaration of K. Knoll, ¶ 6; Ex. 2, Knoll Depo., p. 109:3-4; Ex. 3, BCV of Knoll).

4.      Pursuant to his training, Knoll perceived that Mr. Miller was extremely nervous, his hands shaking, his voice pattern changing, and these signs only escalated when Miller was asked and was speaking about drugs. Throughout the encounter, Knoll made observations based on what he was perceiving and from his training and experience that, towards the end of the encounter, collectively formed reasonable suspicion that there was a crime underway in connection with drug possession. It was confirmed at autopsy that Miller was positive for methamphetamine at the time of his death. (Ex. 1, Declaration of K. Knoll, ¶¶ 6-8; Ex. 2, Knoll Depo. p. 112:21 – p. 113:4; p. 119:4 – p. 121:3; p. 132:7-12; Ex. 3, BCV of Knoll; Ex. 30, Medical Examiner's Report of Laboratory Analysis).

5.      Having developed this reasonable suspicion, Knoll advised Miller to remain on the scene ("sit tight") as he was going to call for a K-9 to do an external sniff of the vehicle. (Ex. 3, BCV of Knoll; Ex. 1, Declaration of K. Knoll, ¶¶ 10-11; Ex. 2, Knoll Depo., p. 131:6-12).

6.      Upon hearing Knoll say this, Miller decided to leave the scene, saying "I'm gonna go to the house," and he pulled his vehicle away from the law enforcement stop and the officers. (Ex. 3, BCV of Knoll, time: T07:46:56Z; Ex. 1, Declaration of K. Knoll, ¶¶ 11-12).

7.      Knoll then went back to his patrol vehicle and, with Columbus, began to pursue Miller's vehicle as it drove off. Knoll and Columbus activated the lights and sirens of the patrol unit and drove behind Miller, who had fled the scene and now was eluding the officers. (Ex. 3, BCV of Knoll; Ex. 1, Declaration of K. Knoll, ¶¶ 12-15).

8.      Miller and Columbus followed Miller on rural Antlers roads and both saw a baggie fly out the driver's side window, which according to training was perceived as Miller attempting to get rid of illegal drugs. Tammy Scott later told OSBI investigators that Hank Miller was eating drugs during the pursuit, while he was driving and being pursued by officers. (Ex. 1, Declaration of K. Knoll, ¶ 15; Ex. 3, BCV of Knoll; Ex. 4, Columbus Depo., p. 71:1-25; Ex. 5, Audio of OSBI interview with T. Scott).

9.      After about nine minutes of pursuit, Miller's vehicle pulled onto some property in rural Antlers. Neither Knoll nor Columbus had been to this property, and based upon Mr. Miller's comments, both believed they were likely driving onto Mr. Miller's own property. At this point, it was the early morning hours and the property was very dark and featured brush and wooded areas. (Ex. 3, BCV of Knoll, T07:55:54Z; Ex. 1, Declaration of K. Knoll, ¶¶ 12, 18, 23-24; Ex. 6, Walp Depo., p. 197:14 – p. 198:4).

10.     Miller pulled some ways into the property and then momentarily paused the car before it moved again, despite commands from Knoll to Miller during this time. (Ex. 6, Walp Depo., p. 115:18 – p. 116:11; Ex. 3, BCV of Knoll, T07:56:02Z; Ex. 1, Declaration of K. Knoll, ¶¶ 18-19).

11.     At the time, given the circumstances, Knoll elected to run to Mr. Miller's vehicle, and when he arrived at the driver's side window of Miller's vehicle, he pointed his gun and began commanding Miller to stop the car. (Ex. 3, BCV of Knoll, T07:56:49Z; Ex. 1, Declaration of K. Knoll, ¶ 27).

12.     Columbus ran to the passenger side of the vehicle, intending to remove Ms. Scott for her and everyone's safety involved in the incident. (Ex. 3, BCV of Knoll; Ex. 4, Columbus Depo., p. 73:12-21).

13.     At this point, when the officers stationed themselves by the front windows of the vehicle, Miller had not turned off the engine of the car and the car was still moving at times. Mr. Miller's hand was on the shifter during the time that Knoll is at the driver's side window. The video shows movement of the vehicle despite Officer Knoll's commands. Tammy Scott told OSBI officers about forward movement when the officers were at the vehicle, which movement seemed to her as though Miller intended to keep driving to his house. (Ex. 3, BCV of Knoll, time: T07:56:02Z onward; Ex. 6, Walp Depo., p. 109:16-21; Ex. 1, Declaration of K. Knoll, ¶ 28; Ex. 5, Audio of OSBI interview with T. Scott).

14.     Reaching the area next to the passenger door, Columbus ordered Scott to get out of the vehicle. She did not. He opened the passenger door and attempted to get a hold on her. Columbus reached and made contact, accidentally grabbing her hair. He then pulled her out of the vehicle with the passenger door open. (Ex. 4, Columbus Depo., p. 73:12-21; Ex. 7, T. Scott Depo., p. 143:21 – p. 144:3; p. 144:18-22).

15.     With Scott out of the vehicle, Columbus then attempted to go back into the passenger side area, in the door envelope, in order to get Mr. Miller to stop, but the vehicle moved suddenly backward, causing the open passenger door to strike him in the head, knocking him down to the ground. Knoll, from his vantage point across the vehicle, saw Columbus get hit and go down. (Ex. 4, Columbus Depo., p. 80:19-24, p. 91:2-19; p. 98:11-23; p. 100:4-21; Ex. 1, Declaration of K. Knoll, ¶ 31-32).

16.     Columbus fell below the passenger window and below the passenger seat area, and thus Knoll perceived that Columbus was on the ground, very near or under the vehicle. Columbus testified that the corner of the door struck him, he believes, and this sent him to the ground and into a back somersault, he thinks, and when he recovered from this blow, the car began to go forward and he felt that he and Tammy Scott, who was also on the ground, were going to be run over by the back tire. (Ex. 1, Declaration of K. Knoll, ¶¶ 32-34; Ex. 2, Knoll Depo., p. 332:14 – p. 333:4; Ex. 3, BCV of Knoll; Ex. 4, Columbus Depo., p. 80:19-24, p. 91:2-19; p. 98:11-23; p. 100:4-21; Ex. 8, Antlers Fire and EMS Record for Columbus).

17.     On the other side of Miller's car, after Columbus fell and disappeared, Knoll perceived that the car was still moving and was trying to go backwards, with its tires rotating and

3

spinning as though it were stuck in the mud and encountering an obstacle, which was Columbus. This was Knoll's perception as he saw the vehicle and the tires in the moment. (Ex. 1, Declaration of K. Knoll, ¶¶ 32-36; Ex. 2, Knoll Depo., p. 332:14 – p. 333:4; p. 338:4-13; p. 340:1 – p. 343:25).

18.     Thinking that Columbus was on the ground, very near the tires of Miller's vehicle, continuing to move, and perceiving that Miller was intent on continuing to move the vehicle despite commands, Officer Knoll discharged his weapon to prevent Columbus from being imminently killed. (Ex. 1, Declaration of K. Knoll, ¶¶ 32-38; Ex. 2, Knoll Depo., p. 332:14 – p. 333:4; p. 338:4-13; p. 340:1 – p. 343:25).

19.     PCSO Deputy Timothy Steely was coming up, on foot, to the back of Miller's vehicle, wearing a body camera, in the seconds before and during Deputy Knoll's discharging his firearm from his position near the driver's side window. Hence, Steely's body cam video shows a different angle, from a different perspective, than the body cam video of Knoll, which was attached to Knoll's uniform. (Ex. 9, BCV of T. Steely, time: 07:56:25Z).

20.     In the immediate seconds after discharging his weapon, Knoll sees Columbus and says, "I thought he was running you over," a fact he repeats, in various forms, throughout the aftermath of the incident audible on the video. (Ex. 3, BCV of Knoll, first time: T07:57:04Z).

21.     All deputies on the scene, in the few minutes after the shooting, believed Mr. Miller to be deceased. Knoll himself, in the minutes after the shooting, looked into the driver's side window and observed no chest rise, no motion, no further bleeding, and from his training and experience in encountering deceased individuals, Knoll perceived and believed Mr. Miller was deceased immediately after the shooting. (Ex. 1, Declaration of K. Knoll, ¶¶ 40-44).

22.     In addition to his own observations, Knoll spoke with Steely and Columbus in the few minutes after the shooting, and both firmly stated their conclusion that Mr. Miller was deceased, or signal-30, law enforcement code meaning the suspect is deceased. (Ex. 1, Declaration of K. Knoll, ¶¶ 40-44; Ex. 3, BCV of K. Knoll, time T08:03:51Z, Knoll, "Is he alive," Columbus, "No, he's dead,"; Ex. 9, BCV of T. Steely, time T08:02:48Z, Columbus, "He's 30."; time T08:03:22Z, "Driver's Signal 30,"; time T08:04:30Z, "Darrin Goode, "You sure he's Signal 30," Steely, "Yes sir,").

23.     Immediately after the shooting, Steely called for EMS. Once EMS arrived, they confirmed that Miller was deceased. (Ex. 10, Steely Depo., p. 97:20 – p. 98:11).

24.     Mr. Miller's vehicle never fully stopped moving, for any length of time, until Mr. Miller sustained gunshot wounds. The engine was on at the time Deputy Knoll's gun was fired,

and it remained on until EMS arrived in the aftermath of the incident. (Ex. 3, BCV of Knoll; Ex. 11, Antlers Fire and EMS Record for Miller).

25.    The PCSO has a Use of Force Policy which requires deputies to only use the amount of force reasonably necessary to make an arrest or gain control of a situation. The policy prohibits deputies from using deadly force except when it reasonably appears to be necessary to protect themselves or others from immediate threat of death, to prevent a crime in which the suspect's actions place a person in jeopardy of death, or to apprehend a fleeing felon who has used deadly force in the commission of a crime and where there is substantial risk the fleeing felon will cause death, or injury likely to cause death, to others if apprehension is delayed. The policy further requires deputies to warn the suspect about the use of deadly force if circumstances allow. (Ex. 12, Use of Force Policy).

26.    The PCSO has a Policy on Pursuits which required deputies to give the safety of bystanders, the violator, and the deputy higher priority than the apprehension of the suspect(s) during pursuits. (Ex. 13, Pursuits Policy).

27.    As part of its hiring process, the PCSO conducted interviews of applicants, did background checks (running fingerprints and criminal histories), and checked references on a case-by-case basis, depending upon the reference. (Ex. 14, Bray Depo., p. 40:9-18; p. 41:8 – p. 42:2; p. 46:2 – p. 48:14; Ex. 15, Hedgecock Depo., p. 25:19 – p. 26:10).

28.    The PCSO has, and had at the time of the incident in that lawsuit, a Drug and Alcohol Testing Policy. Pursuant to paragraph 15 titled *Confidential Explanation by Individual*, "Any individual who receives a positive drug test results or has otherwise violated this Policy will be given an opportunity to offer an explanation, in confidence, to a representative of the County." (Ex. 16, Drug and Alcohol Testing Policy; Ex. 17, Declaration of B.J. Hedgecock; Ex. 14, Bray Depo., p 43:11 – p. 45:16).

29.    Pursuant to the above-stated policy, upon receiving notification of applicant Keith Knoll testing positive for marijuana on or about May 4, 2021, the Defendant Sheriff asked him if he wanted to offer an explanation for why the test came back positive. Keith Knoll told him that he was taking CBD which he attributes to the reason for the false positive. The Defendant Sheriff knew from experience from prior staff, that while CBD is legal, it has been known to cause false positives for marijuana. (Ex. 17, Declaration of B.J. Hedgecock; Ex. 18, Results of Controlled Substance Test dated 05/04/21).

30.     The Defendant Sheriff offered applicant Keith Knoll an opportunity for retesting. A second specimen was given on May 10, 2021 and on May 12, 2021 the results were negative for the 5-Panel test. (Ex. 17, Declaration of B.J. Hedgecock; Ex. 18, Results of Controlled Substance Test dated 05/12/21).

31.     Timothy Steely was hired by the PCSO on October 19, 2020. At that time, Steely had been a CLEET certified law enforcement officer since 2017 with numerous hours of CLEET training, including training on the use of deadly force, pursuits, First Responder, CPR and First Aid. His first aid and CPR training included responding to an individual that has been shot. Steely also had prior military training regarding assessing the survivability of a gunshot wound. Shortly before being hired by Hedgecock, in July of 2020 Steely completed 40 hours of training to be a "Basic Instructor" for CLEET. In addition, on February 21, 2021 Steely completed CLEET course number 21-1897, titled "Legal Update – Ethical Behavior" taught by Lori Chipps Bray, a certified CLEET instructor employed by the PCSO covering among other things the PCSO Policy on Use of Force and Pursuits. (Ex. 19, Steely Notification of Employment/Termination; Ex. 20, Steely CLEET Profile; Ex. 21, Steely CLEET Certificate; Ex. 31, CLEET Course No. 21-1897; Ex. 10, Steely Depo., p. 10:23 – p. 12:14; p. 12:24 – p. 13:3; p. 53:22 – p. 55:11; p. 67:14 – p. 68:3; p. 69:17 – p. 70:5; p. 72:21 – p. 73:1; p. 75:2-22).

32.     Brian Columbus was hired by the PCSO on April 9, 2021. At that time, Columbus had been a CLEET certified law enforcement officer since 2014 with numerous hours of CLEET training. Prior to becoming CLEET certified, Columbus was a federally certified tribal officer for approximately one year. Columbus' law enforcement training included all aspects of law enforcement, including training on the use of force (including deadly force), vehicle pursuits, traffic stops, how to remove someone from a vehicle during a traffic stop. At the time of his hiring at the PCSO, Columbus also received on-the-job training, including shadowing other deputies for approximately a week and a half. (Ex. 22, Columbus Notification of Employment/Termination; Ex. 23, Columbus CLEET Profile; Ex. 4, Columbus Depo., p. 17:5 – p. 20:9; p. 22:16-19; p. 39:11-19; p. 40:7-13; p. 135:8 – p. 136:19; p. 136:25 – p. 137:13; p. 139:20 – p. 140:4).

33.     Keith Knoll was hired by the PCSO on May 12, 2021. At that time, Knoll had been a certified law enforcement officer certified by the Texas Commission of Law Enforcement (TCOLE) since 2016, and was requesting CLEET reciprocity. Knoll had numerous hours of TCOLE training, including training on use of force, basic peace office course, firearms, traffic stops, officer involved shooting, defensive tactics, police field training, basic S.W.A.T. course,

6

and civilian interaction. At the time of his hiring at the PCSO, Knoll also received on-the-job training, riding with Deputy Steely for two days. (Ex. 24, Knoll Notification of Employment/Termination; Ex. 25, Knoll TCOLE Licensure; Ex. 26, Knoll TCOLE Profile; Ex. 15, Hedgecock Depo., p. 28:5 – p. 29:11; Ex. 2, Knoll Depo., p. 366:18 – p. 367:20; p. 368:6 – p. 369:3; p. 381:22 – p. 382:12).

34.     At the time of his hiring by the PCSO, Knoll had been evaluated by a licensed Texas psychologist and found to be in satisfactory psychological and emotional health to perform the duties, accept the responsibilities, and meet the qualifications of a law enforcement officer. The evaluation was sent to, and accepted by, CLEET. Subsequently, on or about April 26, 2023, Knoll was evaluated by a licensed Oklahoma psychologist and found to be psychologically suitable for employment as a peace officer. (Ex. 27, Licensee Psychological and Emotional Health Declaration; Ex. 28, Notification of Psychological Evaluation for Peace Officers; Ex. 15, Hedgecock Depo., p. 29:12 – p. 30:7; p. 81:16 – p. 84:17; Ex. 2, Knoll Depo., p. 84:1 – p. 85:15; p. 369:23 – p. 371:1; Ex. 14, Bray Depo., p. 55:11 – p. 58:14).

35.     After review, the District Attorney for Pittsburg and Haskell Counties found that the actions taken by Knoll did not rise to a criminal level, and declined to pursue any criminal charges against him in relation to the shooting. (Ex. 29, DA Letter dated 07/20/21).

36.     This was the first officer-involved shooting that the PCSO has had during the Defendant Sheriff's tenure. (Ex. 15, Hedgecock Depo., p. 59:11-13).

37.     Prior to the subject incident, Deputy Knoll had never been accused of using excessive in performance of his law enforcement duties. (Ex. 2, Knoll Depo., p. 371:12-17).

38.     Prior to the subject incident, Deputy Knoll had never discharged his firearm in the performance of his law enforcement duties. (Ex. 2, Knoll Depo., p. 371:18-25).

39.     Plaintiffs' own expert witness, Dr. Glenn Walp, acknowledges that Deputies Knoll, Columbus, and Steely had all received appropriate training in first aid for police responders during their basic police training, and had been appropriately trained of the requirement to render first aid during such circumstances. He admitted the practice of the PCSO was to render aid as evidenced by the PCSO commander's directives to Steely at the scene and had no criticism of the PCSO in that regard. (Walp Expert Report dated November 1, 2024, pp. 33-34 (Dkt. 94); Ex. 6, Walp Depo., p. 251:18 – p. 252:11; p. 254:10-11; p. 281:16-17; p. 318:10-15; p. 329:22 – p. 331:9; p. 350:13 – p. 351:25; p. 364:14 – p. 365:5).

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court held that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." The Court further held that "if the evidence is merely colorable, or not significantly probative, summary judgment may be granted." *Id.* In addition, the *Anderson* Court stated that "the mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* A movant's summary judgment burden may properly be met by reference to the lack of evidence in support of plaintiff's position. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325).

Furthermore, as described by the court in *Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994), "Even though all doubts must be resolved in (the nonmovant's) favor, allegations alone will not defeat summary judgment." *Cone* at 530 (citing *Celotex*, 477 U.S. at 324). *See also Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); *Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464, 469 (D. Colo. 1996). Moreover, "(i)n response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

## I.    THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT WITH REGARD TO PLAINTIFFS' 42 U.S.C. § 1983 CLAIMS

Plaintiffs assert municipal liability claims against the Defendant under 42 U.S.C. § 1983 for the alleged violation of the Decedent Hank Miller's and Plaintiff Tammy Scott's Fourth Amendment rights based upon alleged deliberately indifferent hiring, training, and supervision. However, the Defendant is entitled to summary judgment with regard to Plaintiffs' § 1983 claims.

A.    **Custom, Policy, or Practice**

The Defendant cannot be held liable under § 1983 based upon the doctrine of *respondeat superior* or vicarious liability. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694-95 (1978). In *Monell,* the Supreme Court held that a governmental entity is only liable under § 1983 when the constitutional injury can fairly be said to have been caused by that entity's own policies and customs. *Id.* at 694. The actions of the governmental entity must be the moving force behind the constitutional violation. *Id.* The Supreme Court has held that governmental liability for a constitutional violation "attaches where - and only where - the entity makes a deliberate choice to follow a course of action from among various alternatives." *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986).

The Defendant may not be held liable simply because it "employ[s] a tortfeasor." *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997). Additionally, "[t]hat a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation." *Id.* at 406-07. Rather, *Monell* requires Plaintiff to establish that a policy or custom of the CCDC existed and that it caused the alleged constitutional violation. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821-22 (1985); *see also Hinton*, *supra*. (plaintiff must show that there is a direct causal link between the policy or custom and the injury alleged).

Furthermore, it is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality. *Brown,* 520 U.S. at 408. The plaintiff must also demonstrate that, through its *deliberate conduct*, the municipality was the "*moving force*" behind the injury alleged. *Id.* (emphasis added). Moreover, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405.

> Municipal liability may be based on a formal regulation or policy statement, or it may be based on an informal custom so long as this custom amounts to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (citations and internal quotation marks omitted).

In order for a municipality to be held liable for an un-official practice under § 1983, the practice must be "so permanent and well settled as to constitute a custom or usage with the force of law...In order to establish a custom, the actions must be persistent and widespread ... practices of [city] officials." *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (internal citations and quotation marks omitted). In determining what level of persistent and widespread conduct will be sufficient to establish municipal liability, it is clear that "normally random acts" and "isolated incidents" are not sufficient to establish a municipal custom. *Murphy v. Bitsoih*, 320 F. Supp. 2d 1174, 1196 (D.N.M. 2004) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988)). A "meager history of isolated incidents" is insufficient to establish municipal custom; rather "numerous particular instances of unconstitutional conduct" is required. *Jones v. Hacker*, 2015 WL 1279357, at *11 (E.D. Okla. Mar. 20, 2015) (unpub)[1] (citations and internal quotation marks omitted).

Here, Plaintiffs cannot demonstrate that the alleged violation of the Decedent's or Plaintiff Scott's constitutional rights was caused by any policy, practice or custom of the PCSO. To the contrary, the CCDC had implemented policies and practices aimed at preventing such violations. In that regard, the PCSO has a Use of Force Policy which requires deputies to only use the amount of force reasonably necessary to make an arrest or gain control of a situation. The policy prohibits deputies from using deadly force except when it reasonably appears to be necessary to protect themselves or others from immediate threat of death, to prevent a crime in which the suspect's actions place person in jeopardy of death, or to apprehend a fleeing felon who has used deadly force in the commission of a crime and where there is substantial risk the fleeing felon will cause death, or injury likely to cause death, to others if apprehension is delayed. The policy further requires deputies to warn the suspect about the use of deadly force is circumstances allow. (Fact No. 25). Furthermore, the PCSO has a Policy on Pursuits which required deputies to give the safety of bystanders, the violator, and the deputy higher priority than the apprehension of the suspect(s) during pursuits. (Fact No. 26).

Clearly, these policies and procedures of the PCSO did not cause the alleged violation of either the Decedent's or Plaintiff Scott's constitutional rights against the use of excessive force. Furthermore, Plaintiff Miller cannot demonstrate that Deputy Knoll's, Columbus', or Steely's alleged deliberate indifference to the Decedent's medical needs was caused by any policy, practice, or custom of the PCSO. Rather, the lack of medical attention to the Decedent by the Defendant

---

[1] A copy of this unpublished Order and Opinion is attached as Exhibit 32.

was a result of their determination that he was already dead, which was confirmed by EMS upon their arrival. (Fact Nos. 21-23). Indeed, no qualified, medical expert has opined that the Decedent was harmed, in any way, by the failure of the Deputies to conduct CPR or provide first aid to the Decedent after shots were fired. Without any such evidence, Plaintiff Miller's claim of medical deliberate indifference on the part of the Deputies must necessarily fail. Moreover, Plaintiffs have no evidence of any persistent and widespread pattern of the use of excessive force against arrestees/detainees or of deliberate indifference to the serious medical needs of arrestees/detainees by PCSO deputies.

Accordingly, the Defendant is entitled to summary judgment to the extent that Plaintiffs' § 1983 claims against him are premised upon allegations of the existence of unconstitutional policies, practices, or customs.

**B.    Hiring**

Where § 1983 municipal liability is premised upon an alleged failure to properly vet a prospective job applicant, the courts must be particularly vigilant in examining the plaintiff's claim:

> Where a plaintiff presents a § 1983 claim premised upon the inadequacy of an official's review of a prospective applicant's record, however, there is a particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself. Every injury suffered at the hands of a municipal employee can be traced to a hiring decision in a "but-for" sense: But for the municipality's decision to hire the employee, the plaintiff would not have suffered the injury. To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged.

*Board of County Commissioners v. Brown*, 520 U.S. 397, 410 (1997). As such, a mere showing of the general inadequacy of the pre-hire screening of a job applicant is not sufficient to establish deliberate indifference under § 1983. *Id*. at 411. Rather, deliberate indifference occurs "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right..." *Id*. Furthermore, municipal liability cannot be premised upon the mere probability that the inadequately screened applicant could inflict any constitutional injury. *Id*. at 412. Rather, it must depend on a finding that the applicant "was highly likely to inflict the *particular* injury suffered by the plaintiff. The connection between the background of the particular applicant and the specific constitutional violation alleged must be

strong." *Id*. Oklahoma tort law regarding negligent hiring also requires such a strong connection. "The critical element for recovery is the employer's prior knowledge of the servant's propensities to create the specific danger resulting in damage." *Schovanec v. Archdiocese of Oklahoma City*, 188 P.3d 158, 167 (Okla. 2008) (quoting *N.H. v. Presbyterian Church (U.S.A.)*, 998 P.2d 592, 600 (Okla. 1999), internal quotation marks omitted).

Here, as part of its hiring process, the PCSO conducted interviews of applicants, did background checks (running fingerprints and criminal histories), and checked references on a case-by-case basis, depending upon the reference. (Fact No. 27). However, Plaintiffs simply have no evidence that, prior to their hiring, Deputies Knoll, Columbus, or Steely had any history of the use of excessive force against arrestees/detainees or of deliberate indifference to the serious medical needs of arrestees/detainees. Indeed, prior to the subject incident, Deputy Knoll had never been accused of using excessive in performance of his law enforcement duties, and had never discharged his firearm in the performance of his law enforcement duties. (Fact Nos. 37-38). Furthermore, at the time of his hiring by the PCSO, Knoll had been evaluated by a licensed Texas psychologist and found to be in satisfactory psychological and emotional health to perform the duties, accept the responsibilities, and meet the qualifications of a law enforcement officer. The evaluation was sent to, and accepted by, CLEET. Subsequently, on or about April 26, 2023, Knoll was evaluated by a licensed Oklahoma psychologist and found to be psychologically suitable for employment as a peace officer. (Fact No. 34).

Accordingly, because Plaintiffs cannot demonstrate the requisite strong connection between the applicants backgrounds and the alleged violation of the Decedent's and Plaintiff Scott's constitutional rights, their § 1983 and state tort law claims premised upon deliberately indifferent hiring must necessarily fail, and the Defendant is entitled to summary judgment with regard thereto.

### C.    Training

There are limited circumstances where inadequacy in training can be a basis for § 1983 liability. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*." *Tuttle,* 471 U.S. at 822-23. Inadequacy in training may serve as the basis for municipal liability under § 1983 "only where the failure to train amounts to deliberate indifference..." to inmate rights.

*City of Canton*, 489 U.S. at 388. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality...can a city be liable for such a failure under § 1983." *Id.* at 389. To establish deliberate indifference to a need for training, Plaintiff must show that the Defendant Sheriff knew of and disregarded the substantial risk of inadequate training of their employees. *City of Canton*, 489 U.S. at 388. "It is not enough to allege 'general deficiencies' in a particular training program...Rather, a plaintiff 'must identify a specific deficiency in the [entity's] training program closely related to his ultimate injury, and must prove that the deficiency in training actually caused'" the alleged violation of his constitutional rights. *Keith v. Koerner*, 843 F.3d 833, 839 (10th Cir. 2016) (quoting *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999)). To establish deliberate indifference, Plaintiffs must demonstrate that the Defendant had actual or constructive notice that its action or failure to act was substantially certain to result in a constitutional violation, and that the Defendant consciously or deliberately chose to disregard the risk of harm. *Quintana v. Santa Fe Cty. Bd. of Commissioners*, 973 F.3d 1022, 1056 (10th Cir. 2020).

> In most instances, notice can be established by proving the existence of a pattern of tortious conduct....In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998). (citations omitted).

Here, Plaintiff cannot demonstrate a specific deficiency in the training of PCSO staff which was obvious and closely related to the alleged violation of either the Decedent's or Plaintiff Scott's constitutional rights. To the contrary, the undisputed facts demonstrate that the training of Deputies Knoll, Columbus, and Steely was not constitutionally inadequate. Timothy Steely was hired by the PCSO on October 19, 2020. At that time, Steely had been a CLEET certified law enforcement officer since 2017 with numerous hours of CLEET training, including training on the use of deadly force, pursuits, First Responder, CPR and First Aid. His first aid and CPR training included responding to an individual that has been shot. Steely also had prior military training regarding assessing the survivability of a gunshot wound. Further, in July 2020, shortly before being hired at the PCSO, Steely completed 40 hours of training to be a "Basic Instructor" for CLEET. In addition, on February 21, 2021, prior to this incident, Steely completed CLEET course number 21-1897, titled "Legal Update – Ethical Behavior" taught by Lori Chipps Bray, a certified CLEET

instructor employed by the PCSO covering among other things the PCSO Policy on Use of Force and Pursuits. (Fact No. 31).[2]

Brian Columbus was hired by the PCSO on April 9, 2021. At that time, Columbus had been a CLEET certified law enforcement officer since 2014 with numerous hours of CLEET training. Prior to becoming CLEET certified, Columbus was a federally certified tribal officer for approximately one year. Columbus' law enforcement training included all aspects of law enforcement, including training on the use of force (including deadly force), vehicle pursuits, traffic stops, how to remove someone from a vehicle during a traffic stop. At the time of his hiring at the PCSO, Columbus also received on-the-job training, shadowing other deputies another deputy for approximately a week and a half. (Fact No. 32).

Finally, Keith Knoll was hired by the PCSO on May 12, 2021. At that time, Knoll had been a certified law enforcement officer certified by the Texas Commission of Law Enforcement (TCOLE) since 2016, and was requesting CLEET reciprocity. Knoll had numerous hours of TCOLE training, including training on use of force, basic peace office course, firearms, traffic stops, officer involved shooting, defensive tactics, police field training, basic S.W.A.T. course, and civilian interaction. At the time of his hiring at the PCSO, Knoll also received on-the-job training, riding with Deputy Steely for two days. (Fact No. 33).

Furthermore, Plaintiffs' expert witness, Dr. Walp, acknowledges that Deputies Knoll, Columbus, and Steely had all received appropriate training in first aid for police responders during their basic police training, and had been appropriately trained to render first aid during such circumstances. Walp admitted the practice of the PCSO was to render aid as evidenced by the PCSO commander's directive to Steely at the scene and had no criticism of the PCSO in that regard. (Fact No. 39).

As such, Plaintiffs cannot demonstrate any specific deficiency in the training of Deputies Knoll, Columbus, or Steely that was obvious and closely related to the alleged violation of either

---

[2] CLEET-certification supports summary judgment with respect to any argument that a governmental entity had a policy or custom of failing to train or supervise its officers. *Jones v. Hacker*, No. 13-CV-00444-JHP, 2015 WL 1279363, at *8 n.7 (E.D. Okla. Mar. 20, 2015) (unpub). A copy of this unpublished Order and Opinion is attached as Exhibit 33. This acceptance should also be given to certified law enforcement training provided by the State of Texas' CLEET equivalent, the Texas Commission on Law Enforcement (TCOLE) (Knoll) as well as the federal government's CLEET equivalent, the Federal Law Enforcement Training Centers (FLETC) (Columbus).

the Decedent's or Plaintiff Scott's constitutional rights. Moreover, Plaintiff has no evidence of any persistent and widespread pattern of violation of any history of the use of excessive force against arrestees/detainees or of deliberate indifference to the serious medical needs of arrestees/detainees by PCSO deputies that would have put the Defendant on notice of the need for any additional or different training in that regard. *Cf Connick*, 563 U.S. at 62 (holding that a pattern of similar constitutional violations is typically necessary to prove deliberate indifference). Thus, Plaintiff cannot demonstrate that the Defendant was deliberately indifferent to any inadequacies in the training of PCSO staff.

Accordingly, the Defendant is entitled to summary judgment to the extent that Plaintiffs' § 1983 claims against him are premised upon allegations of inadequate training.

### D.    Supervision

"Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown,* 520 U.S. at 405. "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate…supervision…" *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013)).

Supervisory "status by itself is insufficient to support liability." *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996). In order to prevail on such a claim, Plaintiffs must present evidence of an affirmative link between the alleged constitutional violations and the Defendant's failure to supervise. *Keith*, 843 F.3d at 838. Additionally, "[i]t is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the supervisor had done more than he or she did." *Wright v. Rasmussen*, 2018 WL 4832356, at *7 (E.D. Okla. Oct. 4, 2018) (unpub)[3] (quoting *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)). Rather, Plaintiffs must show that the Defendant was deliberately indifferent to the deprivation of the Decedent's and Plaintiff Scott's rights. *See City of Canton*, 489 U.S. at 397. To establish deliberate indifference, Plaintiffs must demonstrate that the Defendant had actual or constructive notice that his action or failure to act was substantially certain to result in a constitutional violation, and that he consciously or deliberately chose to disregard the risk of harm. *Quintana,* 973 F.3d at 1056. Furthermore, in

---

[3] A copy of this unpublished Opinion and Order is attached as Exhibit 34.

order to establish a failure to supervise claim, Plaintiff "must show that the defendant was adequately put on notice of prior misbehavior." *McClelland v. Facteau*, 610 F.2d 693, 697 (10th Cir. 1979)

Here, however, Plaintiffs simply has no evidence of any affirmative causal link between the alleged violation of the Decedent's or Plaintiff Scott's constitutional rights and any failure on the part of the Defendant to supervise PCSO staff in general or Deputies Knoll, Columbus, or Steely in particular. Nor does Plaintiff have any evidence of a persistent and widespread pattern of similar constitutional violations which would have placed the Defendant on notice of any need to more closely supervise to supervise PCSO staff in general or Deputies Knoll, Columbus, or Steely in particular. Thus, Plaintiff cannot demonstrate that the Defendant Sheriff was deliberately indifferent with regard to the supervision of PCSO staff.

Accordingly, the Defendant is entitled to summary judgment to the extent that Plaintiffs' § 1983 claims against him are premised upon the alleged failure to supervise.

## II.    THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT WITH REGARD TO PLAINTIFFS' STATE LAW TORT CLAIMS

### A.    Plaintiff Miller's Wrongful Death/Excessive Force Claims

Although Plaintiff Miller's state law wrongful death and excessive force claims are brought as two separate claims (Dkt. 37, pp. 10-11), they are essentially a single state law claim for excessive force.[4] The Plaintiffs' state law claims are necessarily brought pursuant to the Oklahoma Governmental Tort Claims Act ("OGTCA"), Okla. Stat. tit. 51, §§ 151, *et seq*. The OGTCA is the exclusive remedy by which an injured plaintiff may recover against an Oklahoma governmental entity in tort. *Fuller v. Odom*, 741 P.2d 449, 451 (Okla. 1987); *see also* Okla. Stat. tit. 51, §§ 152(14) and 153. In the OGTCA, Okla. Stat. tit. 51, § 152.1(A), the legislature adopted and reaffirmed sovereign immunity for the State, its political subdivisions, and all employees acting within the scope of their employment. Accordingly, the Defendant may be liable for his torts or the torts of his employees in situations where private persons or entities would also be liable under state law. Okla. Stat. tit. 51, § 153(A); *see also*, *Salazar v. City of Oklahoma City*, 976 P.2d 1056, 1066 (Okla. 1999).

---

[4] Oklahoma's wrongful death statute "...does not expand the scope of claims or the number of persons entitled to bring an action, but merely entitles someone to bring what the decedent could have brought himself." *Econ. Fire & Cas. Co. v. Faulkner*, 790 F. Supp. 1082, 1085 (W.D. Okla. 1991) *aff'd*, 951 F.2d 1258 (10th Cir. 1991).

In Oklahoma, law enforcement officers have a special dispensation from the duty of ordinary care not to endanger others. A law enforcement officer's duty in this regard is to use only such force in conducting his law enforcement duties as a reasonably prudent police officer would use in light of the objective circumstances confronting the officer at the time. In applying this standard, an officer's subjective mistake of fact or law is irrelevant, including whether he is acting in good faith or bad. The question is whether the objective facts support the degree of force employed. In considering the "objective reasonableness" of an officer's use of force, the Court considers the totality of the circumstances, including, but not limited to: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of law enforcement officers or others; (3) whether the suspect was actively resisting; (4) the known character of suspect; (5) the existence of alternative methods; (6) the physical size, strength and weaponry of officer compared to those of suspect; and (7) the exigency of the moment. *See*, *Morales v. City of Okla. City*, 230 P.3d 869, 878-881 (Okla. 2010).

Here, Deputy Knoll was faced with a driver who illegally and unexpectedly fled from the scene of a traffic stop, whom he had a reasonable suspicion was involved in the crime of drug possession, who repeatedly refused commands to stop his vehicle, who had already struck Deputy Columbus with the door of the vehicle, knocking him to the ground, and who appeared – from Deputy Knoll's perspective – to be in imminent danger of running over Deputy Columbus. (Fact Nos. 2-20). Considering the totality of the circumstances, it is clear that Deputy Knoll's use of force was objectively reasonable.

Accordingly, the Defendant is entitled to summary judgment with regard to Plaintiff Scott's state law excessive force claim.

### B.    Plaintiff Scott's Excessive Force Claim

Likewise, considering the totality of the circumstances discussed above, Deputy Columbus' use of force upon Plaintiff Scott was also objectively reasonable. Columbus ran to the passenger side of the vehicle, intending to remove Ms. Scott for her and everyone's safety involved in the incident. (Fact No. 12). Reaching the area next to the passenger door, Columbus ordered Scott to get out of the vehicle. She did not. He opened the passenger door and attempted to get a hold on her. Columbus then pulled her out of the vehicle with the passenger door open. (Fact No. 14). Moreover, to the extent that Plaintiffs' state law excessive force claim is premised upon the allegation that Deputy Columbus pulled her out of the vehicle by her hair, she has failed to state a viable excessive force claim because Columbus' grabbing her hair was accidental. (Fact No. 14).

17

*See*, *Kingsley v. Hendrickson*, 576 U.S. 389, 396 (2015) (holding that a detainee harmed by an accidental application of force "cannot prevail on an excessive force claim").

Accordingly, the Defendant is entitled to summary judgment with regard to Plaintiff Scott's state law excessive force claim.

### C.    Plaintiffs' Claims of Negligent Hiring, Training, and Supervision

Plaintiffs have asserted tort claims against the Defendant for negligent hiring, training, and supervision. (Dkt. 37, p. 12). However, under Oklahoma law, such are only applicable to cases wherein there is no *respondeat superior* liability. *See*, *Jordan v. Cates*, 935 P.2d 289, 292-293 (Okla. 1997). Under the OGTCA, the Defendant has *respondeat superior* liability for the torts of his deputies acting within the scope of their employment. Okla. Stat. tit. 51, § 153(A). As such, Plaintiffs' claims for negligent hiring, training, and supervision are simply not applicable in this case. Furthermore, the Defendant is immune from suit for such claims pursuant to Okla. Stat. tit. 51, § 155(5) which provides tort immunity for the "[p]erformance of or the failure to exercise or perform any act or service which is in the discretion of the state or political subdivision or its employees…" *See Scott v. Mid-Del Schools Board of Education*, 229 F.Supp.3d 1254, 1264-65 (W.D. Okla. 2017), *aff'd*, 724 Fed.Appx. 650 (10th Cir. 2018) (unpub); *Young v. Oklahoma City Pub. Sch., Indep. Sch. Dist. 89*, No. CIV-13-633-M, 2013 WL 6567144, at *3 (W.D. Okla. Dec. 13, 2013) (unpub).[5] Moreover, for the reasons discussed in Proposition I(B), (C), and (D) and Proposition II (A) and (B) above, the was not negligent with regard to the hiring, training, or supervision of Deputies Knoll, Columbus, or Steely.

Accordingly, the Defendant is entitled summary judgment with regard to regard to Plaintiffs' claims of negligent hiring, training, and supervision.

### CONCLUSION

The Defendant is entitled to summary judgment. Plaintiffs cannot demonstrate that the alleged violation of the Decedent's or Plaintiff Scott's federal constitutional rights were caused by any policy or custom of the PCSO or by deliberately indifferent hiring, training, or supervision of PCSO staff. Likewise, with regard to their state law wrongful death and excessive force claims, Plaintiffs cannot demonstrate that Deputies Knoll's or Columbus' uses of force were objectively unreasonable. Consequently, for all the reasons state above, Plaintiffs' state law claims for negligent hiring, training, and supervision must likewise fail. Furthermore, Plaintiffs' state law

---

[5] Copies of these unpublished Orders are attached hereto as Exhibits 35 and 36.

claims for negligent hiring, training, and supervision are inapplicable to this case as respondeat superior liability exists under the OGTCA, and the Defendant is immune from suit for such claims in any event under the terms of the OGTCA.

WHEREFORE, premises considered, Defendant B.J. Hedgecock, in his official capacity as Sheriff of Pushmataha County, State of Oklahoma, respectfully requests the Court to grant summary judgment in his favor and to dismiss all of Plaintiffs' claims against him with prejudice to the re-filing thereof.

Respectfully submitted,

s/ Jamison C. Whitson
Wellon B. Poe, OBA No. 12440
Jamison C. Whitson, OBA No. 18490
COLLINS ZORN & WAGNER, PLLC
429 N.E. 50th Street, Second Floor
Oklahoma City, OK 73105
Telephone:    (405) 524-2070
Facsimile:    (405) 524-2078
E-mail:        wbp@czwlaw.com

**ATTORNEY FOR DEFENDANT B.J. HEDGECOCK**

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2024, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Damario Solomon-Simmons
SOLOMON SIMMONS LAW, PLLC
601 S. Boulder Avenue, Suite 602
Tulsa, OK 74119

– and –

J. Spencer Bryan
Steven J. Terrill
BRYAN & TERRILL LAW, PLLC
2500 S. Broadway, Suite 122
Edmond, OK 73013

**Attorneys for Plaintiff**

Robert S. Lafferrandre
Carson C. Smith
John H. Kim
PIERCE COUCH HENDRICKSON
  BAYSINGER & GREEN, L.L.P.
1109 N. Francis Avenue
Oklahoma City, OK 73106

***Attorneys for Defendants Keith Knoll
and Timothy Steely***

s/ Jamison C. Whitson
Jamison C. Whitson