IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

DAN MILLER, as Special Administrator of the )
ESTATE OF HANK MILLER, Deceased, )
TAMMY SCOTT, an individual, )
)
                Plaintiffs, )
)
v. ) Case No. CIV-22-164-RAW
)
B. J. HEDGECOCK, in his official capacity as )
Sheriff of Pushmataha County, State of )
Oklahoma, )
*et al.*, )
)
                Defendants. )

### DECLARATION OF KEITH KNOLL

I, Keith Knoll, being of lawful age, pursuant to 28 U.S.C. 1746, declare under penalty of perjury that the following is true and correct:

1. I was working as a deputy Sheriff for the Pushmataha County Sheriff's Office on May 30, 2021. I had been employed there for about three weeks at that point in time.
2. I was working the night shift on that evening. Around 2:00am, I had deputy Columbus with me in my Sheriff's vehicle. We were parked near the Choctaw Travel Plaza in Antlers, which was a known hub of drug activity in the area, especially after 10pm.
3. I noticed a white sedan leaving the Travel Plaza, and I noticed that its license plate was obscured and not legible.
4. I initiated a traffic stop of the vehicle, going to the driver's side window of this vehicle.
5. When I arrived at the window, I spoke with the driver, whom I did not know.
6. The driver, whom I later learned was Hank Miller, seemed nervous when speaking with me, and he noted that he did not have a driver's license, which was suspended due to his possessing drugs in his vehicle.
7. When I asked if he had any illegal drugs in his vehicle, I noticed that Mr. Miller became even more nervous, with his hands and voice shaking and his speech

**EXHIBIT 1**

pattern changing. Also I could see his breathing rate change, as well as Miller looking towards the center console.

8. These signs of extreme nervousness continued even after I noted to him that I was not that worried about the license plate issue.
9. I asked Mr. Miller if he minded if I searched his vehicle, and he stated that he did mind.
10. I had not yet gone back to my vehicle at this point in time.
11. I advised Mr. Miller that I was calling a deputy with a drug dog and for him to "sit tight" and that I was going to get the canine out to the scene.
12. At this point, I began walking back to my car, and Mr. Miller started pulling away in his car, saying he was "going to go to the house" or something akin.
13. Deputy Columbus, who had been talking to the passenger, and I saw Miller pull away from our law enforcement presence, and we got into our car, deciding to pursue Miller, whom we had probable cause on multiple grounds to arrest at this point.
14. A pursuit ensued where we followed Mr. Miller at a low speed on county roads.
15. During this pursuit, I saw a baggie fly out the window of Miller's car. From my training and experience, I believed this to be Miller's attempt to get rid of drugs in his possession and in his vehicle.
16. Seeing this, I called out the location on the radio to dispatch.
17. I had my lights and siren activated the entire pursuit, and I also used the public address overhead system to order Miller to stop and to pull over. He did not.
18. Eventually, Miller pulled into a piece of property, which I thought probably led to his residence.
19. Miller's car seemed to stop in the grass, and I and Columbus got out and rushed to the sides of the vehicle, to the driver and passenger window, respectively.
20. Given that that Mr. Miller had fled, contrary to an order to remain at the scene of the traffic stop, and had continued to flee and disobeyed my orders to stop during the pursuit, I did not expect Mr. Miller to suddenly respond obediently to any further orders.
21. I had never been involved in a pursuit, where a person choses to flee from law enforcement presence, which ended in a way where the person simply exits the vehicle calmly and complies with all orders at that point. Based on my training and experience, I think this would be rare for most officers.
22. Although it was dark, as we pulled into the property, I could see that there was brush and trees near where Miller's vehicle had first come to rest. Additionally, it is well known that the outskirts of Antlers are a fairly wooded area in general.
23. In view of what had happened to that point, I was worried about Mr. Miller getting out of his car and fleeing into the brush on his property or into his house, where he may have access to weapons or other unknown items or persons that would further endanger us as officers and escalate the situation overall. Further,

we would be at a major disadvantage in terms of trying to catch up with or find Mr. Miller if he took several steps and was lost in the brush.
24. Columbus and I had never been to this property, and thinking we were likely on Miller's property, we believed he would know this property well, much better than us.
25. Therefore, I decided it would be best to run to Miller's vehicle to keep him from fleeing on his property into the brush or into his house. I did not think conducting a felony stop, i.e. staying at our vehicle giving commands, was a good option, considering the unknowns, the property at nighttime, and risks presented by the overall circumstances.
26. Both Columbus and I drew our firearms as we quickly approached the vehicle, given what had occurred to that point and the risks presented by the situation.
27. Miller's car started moving as I approached it, and I yelled orders at him to "Stop the car," but the car continued to move.
28. When I was stationed at the driver side window, with my gun drawn, Mr. Miller was talking and I could see that his right hand was down by the shifter of the car.
29. Mr. Miller was still in control of the car at this point, which I observed had not been stopped and put in park.
30. The engine was on and running throughout this incident. It was not turned off by Miller at all. It remained on until first responders arrived after the incident.
31. Suddenly, I saw what seemed to be a part of the car strike Columbus, who was on the other side of the car, at the passenger side window, and Columbus fell downward, out of my view, with Miller's car in between myself and Columbus.
32. I could see this happen through the window of the driver's side and through the window of the passenger side, and from my vantage point, I saw Columbus fall below the passenger's side window of the interior of the car and disappear.
33. At this point in time, as events unfolded quickly, I thought Columbus was on the ground very close to the front passenger tire of Miller's car. I did not know exactly where the passenger, the female, was at the time, but I thought she was beside Columbus.
34. It appeared to me that Miller intended to keep moving the car and to keep from submitting to our orders and our law enforcement presence.
35. I could see Miller's hand moving on the steering wheel during these moments.
36. Miller's car continued to move, despite my commands to Miller to stop the car, and I could see the tires rotate (left and right) and spin, as though trying to gain traction or get over an obstacle.
37. At this point in time, due to everything I had seen and was seeing, I perceived and thought that Miller's car was or was very close to running over Columbus on the ground. I thought Columbus was under the car at this point.
38. At this moment, I discharged my firearm at Miller in order to save Columbus from being killed by the car.

39. With what I was perceiving in this rapid event and what I believed was occurring, I did not have time to do anything other than respond with my firearm. We did not have Tasers at Pushmataha County Sheriff's Office.
40. After shooting, I could see that the shots had disabled Mr. Miller, who immediately after the shots were fired was slumped over in the driver's seat of his car.
41. I acted in the moments after the shooting in a reflexive way according to my training, asking Columbus to cover Mr. Miller. Columbus came to the driver's side of the car to do so.
42. When I first looked into the driver's side window after the shooting, I saw Mr. Miller clearly and believed him, at this moment, to be deceased for numerous reasons.
43. Mr. Miller had no chest rise. He was no longer actively bleeding from any wounds, including those on his left side, indicating that his heart had stopped pumping. He did not appear to be breathing. There was no motion at all that I saw. From what I observed with Mr. Miller, his condition was consistent with several other individuals whom I had observed to be deceased in the course of my law enforcement career. There was no sign of life whatsoever with Mr. Miller, and there were multiple signs that he was deceased.
44. I also knew that the rounds I had fired had struck Mr. Miller in the chest, side and arm areas and were not merely glancing or surface injuries that could be consistent with recovery or survival.
45. A few minutes after the shots were fired and I had been away from Miller's car, I asked Columbus and Steely, who had been up around and near Miller's car, if Miller was alive and was told he was dead.
46. Signal 30 is common law enforcement code that means the subject is deceased.
47. Because I believed Mr. Miller was dead when I closely observed him, because I also was informed he was dead by fellow officers, and because we had alerted and summoned EMS, I did not perform any CPR or render any aid to Mr. Miller.
48. I did not think that any amount of resuscitation would be effective for the gunshot wounds to Miller's chest and side and due to his deceased condition that I observed.
49. Also, during this time in the minutes after the shots were fired, I was complying with orders from Officer Steely, who was handling the scene in the immediate aftermath of the event. He was placing calls to supervisors at the Pushmataha County Sheriff's Office and was attending to me and to Columbus, as well.
50. I have reviewed the body camera footage. This footage shows one angle, that of my body camera, but it does not capture everything that I saw with my eyes. My body camera did not swivel or have perspective comparable to human sight, which is able to take in wider angles and move left or right, for instance.

The facts, statements, and assertions set forth above are true and correct to the best of my knowledge, information, and belief.

Dated: _December 12_, 2024

 

_____
Keith Knoll