IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

DAN MILLER, AS SPECIAL           )
ADMINISTRATOR FOR THE ESTATE     )
OF HANK MILLER, DECEASED,        )
                                 )
     Plaintiff,                  )
                                 )
       -vs-                      ) No. 22-cv-164-RAW
                                 )
B.J. HEDGECOCK, IN HIS           )
OFFICIAL CAPACITY AS SHERIFF     )
OF PUSHMATAHA COUNTY, STATE      )
OF OKLAHOMA; ET AL.,             )
                                 )
     Defendants                  )

VIDEOCONFERENCE DEPOSITION OF KEITH KNOLL

TAKEN ON BEHALF OF THE PLAINTIFF

ON FEBRUARY 20, 2024

REPORTED BY:  MARTA MATTINGLY, CSR, RMR

**EXHIBIT 2**

Page 84

1  is up here.  It was me sitting down, meeting with a

2  licensed mental health professional for, I don't know,

3  it was probably about three hours, and there was like a

4  400 questionnaire we went through, all that stuff.  They

5  did an evaluation and sent it over to the sheriff's

6  office or to the academy.  I don't remember which one

7  they sent it to.

8       Q    And that was in 2016.  And it was not a MMPI,

9  was it?

10      A    No.  Because MMPI is an Oklahoma only thing.

11 It was Texas' version of it.

12      Q    So you never, have never to this day, done a

13 MMPI, have you?

14      A    Yes, sir, I have.

15      Q    When did you do it?

16      A    May of 2023, when I started at String Town

17 police department.

18      Q    So it wasn't until then that you actually had

19 been in compliance with the Oklahoma requirements for a

20 CLEET license; correct?

21           MR. POE:  Object to the form.

22           THE WITNESS:  CLEET accepted my one from

23 TECOLE.

24      Q    (By Mr. Bryan)  Who at CLEET accepted it?

25      A    Sir, I don't know.  I turned it in to admin

Keith Knoll                                        February 20, 2024

Page 85

1    and they sent it up to CLEET and said that I was good.

2        Q    Which agency?

3        A    Pushmataha.

4        Q    So you sent your TECOLE one to Pushmataha and

5    Pushmataha then sent it to CLEET?

6        A    Yes.

7        Q    And CLEET then approved that as being a mental

8    health certification?

9        A    I say yes; because they didn't require me to

10   go back and take a MMPI.

11       Q    Except when you applied for --

12       A    String Town.  And that wasn't due to CLEET,

13   that was String Town's doing that.  It had nothing to do

14   with CLEET, or anything like that.  String Town just

15   puts all of their new hires through a MMPI.

16       Q    Who was it at the Pushmataha County sheriff's

17   office that received your information from Texas, from

18   TECOLE?

19       A    I believe it would have been Dustin Gray.

20       Q    And who was it that told you that they had

21   sent that to CLEET?

22       A    I believe it would have been Dustin Gray, as

23   well.

24       Q    Where is Dustin Gray these days?

25       A    Sir, I don't know.

Keith Knoll                                           February 20, 2024

Page 104

1  that right?

2      A    Correct.

3      Q    You were taking no CLEET courses until that

4  time; correct?

5      A    Correct.

6      Q    I want to ask you about the incident involving

7  Mr. Knoll -- not Knoll, sorry, you're Knoll, involving

8  Mr. Miller, sorry.  How did the stop begin?

9      A    It initially began by me activating my

10 overhead emergency lights, Mr. Miller pulling down one

11 of the side roads off of the highway, me walking up to

12 the vehicle and making contact with him and speaking to

13 him.

14     Q    The basis for the stop was what, obscured tag?

15     A    Yes, sir.

16     Q    You didn't stop him for erratic driving or

17 swerving; right?

18     A    No, sir.

19     Q    He didn't have slurred speech; right?

20     A    No, sir.

21     Q    You agree his answers were responsive to your

22 questions?

23              MR. SMITH:  Object to the form.

24              THE WITNESS:  I believe that they were

25 actually overly responsive.

Keith Knoll                                    February 20, 2024

Page 109

1   to it again.

2              (video played)

3        A    "I don't have any driver's license" is what I

4   heard in his first statement.

5        Q    My or a, they are both a true statement.

6        A    Fair enough.

7              (video played)

8        Q    He is trying to explain to you why he doesn't

9   have a driver's license and the car is legal; right?

10              MR. SMITH:  Object to the form.

11              THE WITNESS:  I believe that's what he's

12   trying to do.

13        Q    (By Mr. Bryan)  Okay.  He is not -- I mean,

14   that's responsive to what you are asking about; right?

15        A    Yes.

16        Q    He is not being inconsistent with his answers,

17   is he?

18        A    I have only asked him one question.  So it

19   would be hard to say that he is being inconsistent with

20   his answers.  He's only answered one question.

21        Q    But so far he's not been inconsistent; right?

22        A    Sir, I don't have a baseline.  He's answered

23   one question.

24        Q    Right.  But one minute and forty-six seconds

25   into this video you have not heard an inconsistent

Keith Knoll                                          February 20, 2024

Page 112

1   that there were drugs in the car at the time; right?

2        A    No.

3        Q    You are just -- you are just -- you are trying

4   to take a guess that this guy might have drugs in his

5   car?

6                MR. POE:  Object.

7                MR. SMITH:  Object to the form.

8                THE WITNESS:  At this time I am not

9   guessing, I am building reasonable suspicion.

10       Q    (By Mr. Bryan)  So you didn't have reasonable

11   suspicious at this point?

12       A    We are still building that at this point.

13       Q    Gotcha.  But asking about drugs in the car,

14   you have deviated from what you were stopping him for;

15   right?

16       A    No, sir.  He was leaving a -- he was leaving

17   the Travel Plaza Casino in Antlers, which is a known

18   spot for narcotics use and sales at two, three in the

19   morning.  That's a pretty consistent time when we used

20   to have a lot of problems with narcotics in that area.

21                He is leaving that area.  He is very concerned

22   of our present when he drove off.  Then we stopped him.

23   As soon as I started asking about drugs, you notice he

24   started stuttering and all of that stuff.

25                Those are all indicators through my training

Keith Knoll                                           February 20, 2024

                                                        Page 113

 1   and experience of working street level narcotics that

 2   somebody is nervous about the presence of narcotics in

 3   their vehicle.  So, yes, we are pretty far into the

 4   reasonable suspicion at this point.

 5       Q    But you don't have it; right?

 6              MR. SMITH:  Object to the form.

 7              THE WITNESS:  I don't remember at this

 8   point exactly, no.

 9       Q    (By Mr. Bryan)  But the basis, from what I

10   understand, is time, location, and drug activity in the

11   vicinity?

12       A    And he just stated that he had a recent drug

13   history.

14       Q    That he had a drug charge previously.

15       A    When he said that his license --

16              (Short interruption)

17              MR. BRYAN:  Tammy, we can hear you.  You

18   are not on mute.

19              UNIDENTIFIED SPEAKER:  Oh, I'm sorry.

20              MR. POE:  For the record, Ms. Scott

21   appeared in the depo.  And when did she get here?

22              MS. HECKENKEMPER:  She just got here.

23              MR. POE:  She was never identified.

24              MR. SMITH:  Yeah.  How long has Tammy

25   Scott been present for Mr. Knoll's depo?  The entire

Keith Knoll                                        February 20, 2024

Page 119

1           MR. POE:  Object to form.

2           MR. SMITH:  Same.

3           (video played)

4      Q    (By Mr. Bryan)  So at 2:54 you are not even

5  worried about the driver's license stuff; right?

6      A    That's not completely accurate.  That's

7  another thing that we have learned through training and

8  experience, that a lot of times when you stop people in

9  a situation like this and it's just like an expired

10 driver's license, a speeding ticket, something like

11 that, the average person is more nervous about getting

12 the citation than if there's other criminal activity

13 beyond the citation.

14           So a lot of times when you are talking to

15 people in a situation like this, you back it back down

16 and say:  You know, man, I am not real worried about the

17 speed, so that you can get them to not be as nervous

18 about receiving a citation, so you can try and speak to

19 them.

20           If they're still nervous after you say you're

21 not getting a ticket for their driving offense and

22 they're still nervous, there's usually a reason why

23 they're nervous beyond the citation.

24     Q    Okay.  But he's not extremely nervous, he is

25 not shaking or anything.

Page 120

1           MR. POE:  Object to form.

2           THE WITNESS:  Sir, from my opinion and my

3     training, yes, he was very nervous.

4     Q     (By Mr. Bryan)  What is he doing that is

5     extremely nervous?

6     A     The way that he is stuttering and talking.  If

7     you notice, the cigarette is not lit.  He was trying to

8     light that as usually as a cover scent, also a thing

9     that people do when they get pulled over, try and calm

10    their nerves.  The way he's speaking, the stuttering, I

11    can also see that his breathing, his heart rate, are

12    very rapid.

13    Q     You can see his heart rate?

14    A     I can see the pounding in his chest and the

15    carotid arteries in his neck, yes, sir.

16    Q     Okay.  I just want to make sure I understand,

17    that you are going to tell the jury that you have the

18    ability to observe his heart rate and his carotid

19    artery?

20           MR. SMITH:  Object to the form.

21           MR. POE:  Object to the form.

22           THE WITNESS:  Yes.  That's one of the

23    things we are told as police officers, is that when you

24    are interviewing somebody that's in a car, those are

25    some of the things that you look at.  Because you will

Keith Knoll                                           February 20, 2024

Page 121

1   see them visibly get nervous and the veins in their neck

2   visibly start pumping harder and faster as they get

3   nervous.  So, yes, that is what I would testify to.

4        Q    (By Mr. Bryan)  How fast was his heart

5   beating?

6        A    I didn't take his exact pulse.  I am just able

7   to tell a resting heart rate, that it looks like your

8   neck is throbbing.

9        Q    How much did Mr. Miller weigh?

10       A    I don't know.

11       Q    What was Mr. Miller's resting heart rate?

12       A    Sir, I don't know.

13       Q    What was his excitable heart rate?

14       A    Sir, I don't know.

15       Q    What is his extremely nervous heart rate?

16       A    Sir, I don't know.

17       Q    You don't know what his heart rate was; right?

18       A    Say that again.

19       Q    You don't know what his heart rate was; right?

20       A    No.  I could just tell his visible appearance

21   is changing.

22       Q    Okay.  And when did you start looking at his

23   heart rate?

24       A    Sir, like I said, we are trained on observing

25   the whole thing.  It's not like I just walked up and was

Keith Knoll                                        February 20, 2024

Page 131

1    were going to do with the driver's license and the

2    license tag; right?

3                MR. POE:  Object to the form.

4                THE WITNESS:  I wouldn't say deviate.  I

5    have built on top of that now, yes.

6         Q    (By Mr. Bryan)  I mean, you're not bringing

7    out the drug dog to look for his driver's license or to

8    look at the tag; right?

9         A    No.  Now the drug dog is out for continuing

10   charges that are adding up.

11        Q    To look for drugs; right?

12        A    Yes.

13        Q    The drugs that you had no reasonable suspicion

14   of when you asked him if there were drugs in the car;

15   right?

16                MR. SMITH:  Object to the form.

17                THE WITNESS:  I didn't have reasonable

18   suspicion when I initially asked him at the beginning of

19   the traffic stop.

20        Q    (By Mr. Bryan)  Right.  When you asked him,

21   "Do you have drugs in the car," you had yet to create

22   reasonable suspension to support getting the dog;

23   correct?

24                MR. SMITH:  The same.

25                THE WITNESS:  Sir, I asked him a couple

Keith Knoll                                      February 20, 2024

Page 132

1    of times if he had drugs in the car.  You would have to

2    refer to which time you are asking.  Because I made

3    contact.  And when I asked him about it initially, no, I

4    didn't have reasonable suspicion at that point.  This

5    most recent time when I asked him, yes, I did have

6    reasonable suspicion.

7        Q     (By Mr. Bryan)  Right.  So I just want to make

8    clear, that the first time that you asked him you did

9    not have reasonable suspicion to know whether there were

10   drugs in the car, later you developed reasonable

11   suspicion and called for the dog; do I have it right?

12       A     That's correct.  Yes.

13       Q     And the reasonable suspicion that you

14   developed to call the dog was what?

15              MR. SMITH:  Object to the form.

16              THE WITNESS:  The fact that it's a

17   subject that just admitted to me he had recent drug

18   charges, leaving a known area where narcotic sales and

19   use happens, at a time when it happens.  That, to me, is

20   reasonable to believe that the person is probably in

21   possession of drugs.

22       Q     (By Mr. Bryan)  Okay.  And you had been on the

23   job for eighteen days; right?

24       A     I don't know exactly how long I had been

25   employed at Push County.

Keith Knoll                                        February 20, 2024

Page 135

1      Q    So this would have been kind of a one place;
2  right?
3      A    Correct.
4      Q    So it would have been the one place for
5  groceries, gasoline, drugs, casino activity, everything;
6  right?
7                MR. SMITH:  Form.
8                THE WITNESS:  In that area, as far as I
9  know, yes.  When I say one place, I am speaking as to
10  the city of Antlers.  I am not super familiar with the
11  northern part of the county.  I don't know if anything
12  else is open.  But as far as I know, in the area of
13  Antlers, that is the one thing that is open, one of the
14  two gas stations.
15      Q    (By Mr. Bryan)  And he tells you, "I'm going
16  to the house."  And that's obviously him leaving the
17  scene of your stop; right?
18      A    Correct.
19      Q    So you are going to give chase; right?
20      A    Correct.
21      Q    Okay.  And you knew Tammy Scott was in the
22  passenger's seat; right?
23      A    I knew that there was a female or a subject in
24  the passenger's seat.  I didn't know who it was at the
25  time.

Keith Knoll                                    October 7, 2024

Page 332

1    Q    Okay.  Is the car moving at a high rate of

2    speed?

3         MR. SMITH:  Object to the form.

4         THE WITNESS:  No.

5    Q    (By Mr. Bryan) Was Mr. Miller revving the

6    engine?

7    A    I don't really recall the sounds of any of

8    that because it was covered up with sirens and stuff,

9    so I wouldn't have been able to hear if he was

10   revving the engine or not.

11   Q    So just to be clear, you don't have any

12   recollection of hearing an engine revving?

13   A    That is correct.

14   Q    Okay.  And after you observe this end of

15   the door hit Brian Columbus, you saw Brian fall down

16   onto the ground, right?

17   A    So what I could see was, as it struck him

18   he crumpled down into the space between the open door

19   and the interior door entry of the vehicle.

20        As I saw him going down I lost sight of him

21   at about the level of where the seat is visible.  And

22   then just -- I guess, based on my perspective of how

23   he'd fallen down in that little pocket and I never

24   saw him pop back up, I never saw him roll away, never

25   saw him roll out of the way, as soon as I saw him hit

Page 333

1    the ground -- or as soon as I saw him disappear down

2    into that small space, the tires lost traction and

3    that's where I believed he was under the vehicle

4    getting ran over.

5        Q    Okay.  Where was Tammy Scott?

6        A    I don't know.

7        Q    Was Tammy Scott in the car or out of the

8    car?

9        A    I don't believe she was in the car, solely

10   because I was able to see into where Brian was, so

11   she would have obstructed my view of him.

12       Q    Okay.  So you believe that Tammy Scott was

13   out of the car and, where, on top of Columbus?  Next

14   to Columbus?

15       A    I'll be honest, I don't really -- that

16   wasn't my thought at that point in time.  The main

17   priority was Columbus.  I wasn't really worried about

18   where anybody else was in that second because of --

19   like, I'd seen where he went down at and where he

20   was -- where I perceived him to be on the ground

21   under the tire.

22           I didn't have time to stop, pause and start

23   looking around and take a count for everybody, so I

24   don't -- I wouldn't even be able to begin to tell

25   where you where she was.  Columbus was the only one

Keith Knoll                                          October 7, 2024

Page 338

1    car factually moving at a high rate of speed in

2    reverse?

3         A    No.

4         Q    Okay.  All right.  So Columbus is on the

5    ground, "and because I could tell the car was stuck

6    in the mud."  How could you tell the car was stuck in

7    the mud?

8         A    Because from where I was standing, as the

9    wheels were turning in a reverse rotation I could see

10   the tire tread coming at me and I could see them

11   slipping in the mud.  So I just put two and two

12   together that there's tires that are spinning on a

13   muddy surface, so it's stuck in the mud.

14        Q    Okay.  So if it's spinning in the mud, it's

15   not moving, right?

16             MR. SMITH:  Object to the form.

17             THE WITNESS:  At that point where it had

18   gotten stuck, no, it was -- it had to have moved to

19   that position to get stuck.

20        Q    (By Mr. Bryan) And then at some point it

21   became unstuck, right?

22             MR. SMITH:  Object to the form.

23             THE WITNESS:  I don't know that it ever

24   became unstuck.

25        Q    (By Mr. Bryan) Okay.  So it stayed stuck in

Page 340

1      Q    (By Mr. Bryan) So the car is stuck in the

2   mud.  And while it's stuck in the mud, you also see

3   the tires going forward and backward.  It kept -- you

4   kept seeing the tires going forward and backward,

5   forward and backward, right?

6           MR. SMITH:  Object to the form.

7           THE WITNESS:  Well, sir, once again,

8   that's -- what I was saying, right after a critical

9   incident -- if you read prior to the part that you

10  have highlighted, the stuck in the mud, it actually

11  says "the tires becoming stuck in the mud."  So

12  that's --

13     Q    (By Mr. Bryan) Well, just --

14     A    -- that's -- I'm trying to explain that --

15  you're picking up after the fact.

16          No, the tires were rotating.  They were

17  spinning in the mud.  They were angling back and

18  forth, left and right, while they're spinning and

19  they're building up mud on them while they're

20  spinning.  That's becoming stuck in the mud.

21     Q    Okay.

22     A    That's the best way I can answer all that.

23     Q    Right.  And you kept seeing the tires going

24  back and forth, back and forth, right?

25     A    Back and forth.  They can -- turn left and

Page 341

1  right.  I guess that might be the better

2  clarification is there's movement of the wheels left

3  and right which to me is back and forth.  You turn

4  your wheel back and forth.

5      Q    Oh, so it's not back, forward, it's side to

6  side?

7      A    I'm trying to explain that.  The tires were

8  spinning and the vehicle was trying to move and get

9  unstuck.

10     Q    Uh-huh.

11     A    While they're doing that, the tires are

12  moving side to side, which is what you do when you're

13  trying to get traction, if that kind of clarifies

14  that sentence a little bit better.

15     Q    A little bit.  So just so I have it clear,

16  you're standing there, Columbus is already on the

17  ground, right?

18          MR. SMITH:  Object to the form.

19     Q    (By Mr. Bryan) I'm just following this

20  narrative right here, right?  Columbus is on the

21  ground, you're seeing the car tires going back and

22  forth or back and forth like this (indicating), while

23  spinning and having mud getting stuck --

24     A    And the vehicle's -- yes.

25     Q    And the vehicle is doing one of these

Keith Knoll                                          October 7, 2024

                                                    Page 342

1    (indicating), right?

2        A    It's rocking back and forth like this

3    (indicating).

4        Q    Rocking back and forth and the tires are

5    going side to side?

6        A    Yes.

7        Q    Is that correct?

8        A    Yes.

9        Q    Okay.  So it's rocking back and forth, the

10   tires are going side to side, Columbus is on the

11   ground in the pocket between the door and the car.

12            You think that Columbus is actually

13   underneath the vehicle to some extent, right?

14       A    At the time, that's why I believed that the

15   tires were spinning the way that they were was I

16   believed the ground was too wet for the car to have

17   traction to back up over his body.

18       Q    Uh-huh.  And so how much of Columbus did

19   you believe was underneath the car?

20       A    I don't know.  My fear was that it could

21   have been something as small as his head that was

22   under there, and that would have been a small portion

23   of his body, but that's a pretty important part.  So

24   I don't know.  I honestly believed that a pretty good

25   chunk of it was under the car if the car was unable

Keith Knoll                                              October 7, 2024

Page 343

1    to get traction to back up over him.  I figured it
2    wasn't just like a finger or a toe under there
3    because the car would have been able to gain --
4    overcome that.
5         Q    And you're thinking that the reason the car
6    is having this problem, it's doing -- back and forth
7    and forward and backward and forward and backward is
8    because it's hitting Columbus?
9         A    And he cannot get -- yeah, the tires can't
10   get traction to overcome Columbus's body.
11        Q    So it's not necessarily the mud, it's more
12   Columbus that the car is having problems with?
13             MR. SMITH:  Object to the form.
14        Q    (By Mr. Bryan) Or is it both?
15        A    It's both.  I believe that they were
16   spinning in the mud because the grass was slick and
17   so he was under there, but then it -- the tires were
18   too slick to be able to back up over him so they just
19   started digging into the ground rather than actually
20   getting traction, if that makes sense.
21        Q    Okay.  And Miller, by moving the tires back
22   and forth like this (indicating), is trying to
23   somehow, like, back up or overcome --
24        A    Regain -- yes, sir, regain traction by
25   catching a dry spot with it.

Keith Knoll                                          October 7, 2024

                                                          Page 366
1       A    No, sir.

2       Q    Have you ever had suicidal thoughts?

3       A    Yes, sir.

4       Q    Okay.  Have you ever used drugs besides

5   Delta 8 and steroids?

6       A    No, sir.

7       Q    Have you ever been abusive in a

8   relationship, either physically, mentally, verbally?

9       A    No, sir.

10           MR. BRYAN:  All right.  I will pass the

11  witness.

12           MR. SMITH:  Do you have anything at this

13  point, Wellon?

14           MR. POE:  Yeah.  I do have just a few

15  things.

16                   CROSS-EXAMINATION

17  BY MR. POE:

18      Q    Deputy Knoll, in your deposition previous

19  you made some comment -- can you explain to me when

20  you said you had not been trained -- I think the

21  question was, did you receive any training at

22  Push County.

23           Is that true or did you have any training

24  while at Push County?  How did you understand that

25  question?

Keith Knoll                                          October 7, 2024

                                                     Page 367

 1        A     I guess I understood that one as just

 2   C.L.E.E.T. hours.  Had I attended like, any

 3   C.L.E.E.T. mandated or C.L.E.E.T. hosted, I guess,

 4   classes, C.L.E.E.T. accredited classes, which I have

 5   not.  While I was there I never attended any classes

 6   that I received any type of training hours for or

 7   anything.

 8             The little, I guess, unofficial training I

 9   did get was just kind of the expectations from

10   Sheriff Hedgecock.

11             And then I rode with Sergeant Steely and

12   just kind of went over -- learned some geography,

13   once again kind of the expectations of how they do

14   things, what they do.  He talked to me about my

15   knowledge of the law, case law, things like that.  My

16   basic knowledge as a police officer to verify that

17   the training I was coming from Texas with was

18   legitimate.  But there was never a structured --

19        Q     Not a sit-down classroom setting?

20        A     No, sir.

21        Q     And you did not have to take the bridge

22   academy to be licensed to practice in Oklahoma at

23   that -- or be certified to practice in Oklahoma at

24   the time of this incident; is that correct?

25        A     That's correct.

Keith Knoll                                          October 7, 2024

Page 368

```
 1        Q     But by state law you had time --
 2   Push County had time to get you through a bridge
 3   academy to give you Oklahoma law to go with your
 4   TECOLE training, correct?
 5        A     Yes, sir.
 6        Q     Now, you were an officer for several years,
 7   correct?
 8        A     Yes, sir.
 9        Q     With Grayson County.
10              And you did -- were certified by TECOLE and
11   went through their training and passed their
12   training, including the legal block; is that correct?
13        A     Yes, sir.
14        Q     When you graduated TECOLE as a Grayson
15   County officer, did you understand the standards for
16   the use of different force?
17        A     Yes, sir.
18              MR. BRYAN:  Object to form.
19        Q     (By Mr. Poe) When you came to Oklahoma did
20   you just forget that or did you remember what those
21   standards were?
22        A     No, sir.
23              MR. BRYAN:  Object to form.
24              THE WITNESS:  I remembered them.
25        Q     (By Mr. Poe) The constitutional standards
```

Page 369

1    for the use of deadly force didn't change from Texas
2    to Oklahoma, did they?
3         A    No.
4              MR. BRYAN:  Object to form.
5         Q    (By Mr. Poe) I know that Mr. Bryan asked
6    you -- at some time he talked about PTSD, he talked
7    about suicide thoughts.
8              Did your years of PTSD have any effect on
9    what you did the night -- or the event that occurred
10   that we're here on today?
11        A    No, sir.
12             MR. BRYAN:  Object to form.
13        Q    (By Mr. Poe) (Inaudible) of any suicidal
14   thoughts or the time you spent in a mental health
15   facility have any effect on what you did here?
16        A    No, sir.
17             MR. BRYAN:  Object to form.
18        Q    (By Mr. Poe) The steroid use, did that have
19   any effect on what you did -- or your actions this
20   night?
21             MR. BRYAN:  Object to form.
22             THE WITNESS:  No, sir.
23        Q    (By Mr. Poe) The -- since -- you said you
24   did not have a separate mental health evaluation
25   before you went to work for Pushmataha County,

Page 370

1    correct?

2           A     Correct.

3           Q     And you did not have one -- I believe you

4    went to Boswell after Pushmataha County?

5           A     That's correct.

6           Q     Did you have a separate mental health

7    evaluation then?

8           A     No, sir.

9           Q     You had to have a full mental evaluation --

10   kind of similar to MMPI but whatever is the Texas

11   version of MMPI -- when you first became an officer

12   in Texas, correct?

13          A     Correct.

14          Q     And you had another one by Atoka -- or

15   Stringtown's policies, I think you had another

16   medical -- or mental health evaluation, MMPI, before

17   you started to work there, correct?

18          A     Correct.

19          Q     And were the findings of that -- I guess

20   they were good enough that you were suitable to

21   become a law enforcement officer?

22          A     Yes, sir.

23                MR. BRYAN:  Object to form.

24          Q     (By Mr. Poe) And that continues today,

25   correct?

Keith Knoll                                          October 7, 2024

Page 371

```
 1       A    Yes, sir.
 2            THE WITNESS:  Can we take a break real
 3  quick?
 4            MR. POE:  Sure.
 5            THE WITNESS:  I just want to grab my jacket
 6  real quick.
 7            MR. SMITH:  Yeah.  We'll be back.
 8            (Recess had from 5:24 p.m. to 5:32 p.m.)
 9       Q    (By Mr. Poe) Mr. Knoll, just a few more
10  questions.
11       A    Okay.
12       Q    Prior to this incident involving
13  Mr. Miller, had you ever been accused of any use of
14  excessive force --
15       A    No, sir.
16       Q    -- as an officer?
17       A    No, sir.
18       Q    Prior to this incident, had you ever
19  discharged your firearm in the performance of your
20  duties as a law enforcement officer?
21       A    No, sir.
22       Q    Is this the first time that you felt the
23  need to discharge a firearm because of a concern for
24  the safety of you or fellow officers on the scene?
25       A    Yes, sir.
```

Page 381

1    deployed out in the field?

2         A    No.  The only ones that I would have

3    covered would have been -- take that back.

4              I would have read some 10th Circuit cases,

5    yes.  That wouldn't have been something that I

6    specifically focused on.  It would have been more

7    federal overall case law, more Supreme Court stuff.

8              But, yes, I have read 10th Circuit cases,

9    I've read 9, 5th.  I don't want to say, no, I've

10   never -- I'm trying to say, no, I'm -- yes, I have

11   read them, but, no, I'm not, like, some expert on

12   the 10th Circuit ones.

13        Q    Did you ever receive any training prior to

14   going out in the field with Push County on what the

15   excessive force standard is under 10th Circuit

16   precedent?

17        A    No, sir.

18        Q    Okay.  You said you did do -- you had zero

19   classroom education and training with Push County,

20   right?

21        A    Correct.

22        Q    All right.  And the only training that you

23   had was on-the-job ride-alongs with Steely, right?

24        A    Correct.

25        Q    And how many times did you do that?

Page 382

1       A     I rode with him for two days.

2       Q     Okay.  Two days.  And how long was your

3    shift?

4       A     I don't remember what shifts we worked back

5    then, if it was 8s, 10s or 12s.

6       Q     Okay.  And the only things you covered

7    during that shift were your expectations, geography

8    and law or case law?

9             MR. SMITH:  Object to the form.

10      Q     (By Mr. Bryan) Right?

11      A     Yeah, I mean, that's a pretty broad

12   generalization that I had used, but, yes.

13      Q     Okay.  You said that drugs and steroid use

14   had no effect on you on that day.

15            You're not a doctor, are you?

16      A     No.

17      Q     Do you have any medical training?

18      A     But I know how my body feels from day to

19   day.  And if it felt different one day, that's

20   something I would notice probably more so than what a

21   doctor would even notice about me.

22      Q     For sure.  And you don't have any of the

23   training of a doctor or even a nurse, do you?

24      A     No, I'm not a doctor or a nurse.

25      Q     You have no education, training or