```
                                                    Page 1
         IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF OKLAHOMA


DAN MILLER, AS SPECIAL          )
ADMINISTRATOR FOR THE ESTATE    )
OF HANK MILLERS, DECEASED,      )
                                )
         Plaintiff,             )
                                )
vs.                             ) NO. 22-cv-164-RAW
                                )
B.J. HEDGECOCK, IN HIS          )
OFFICIAL CAPACITY AS SHERIFF    )
OF PUSHMATAHA COUNTY            )
STATE OF OKLAHOMA, ET AL.,      )
                                )
         Defendants.            )


         REMOTE DEPOSITION OF BRIAN COLUMBUS

          TAKEN ON BEHALF OF THE PLAINTIFF

                ON NOVEMBER 13, 2024

             IN OKLAHOMA CITY, OKLAHOMA

                      VIA ZOOM



REPORTED BY: HANNAH TIPTON, CSR
```

**EXHIBIT 4**

Page 17

1  A.     I was MWD then.
2  Q.     What does that stand for?
3  A.     Measurement while drilling.
4  Q.     And how long did you do that?
5  A.     I don't know.  A little while.  It was right
6  until I got into law enforcement, and I got in law
7  enforcement in 2013.
8  Q.     Okay.  And how did you get into law enforcement?
9  A.     When I applied for a job and got the position.
10 Q.     Was there anything that caused you to be
11 interested or give you an interest in law enforcement?
12 A.     I had a cousin that was in law enforcement and
13 it interested me.
14 Q.     Okay.  And where were they employed?
15 A.     I don't remember where he was working at
16 the time.
17 Q.     Do you remember in what capacity or what he did?
18 A.     I think he was a police chief.
19 Q.     Okay.  Do you know for what town?
20 A.     No.  It was for a tribe I'm pretty sure.  I
21 think he was a police chief then.
22 Q.     Okay.  What about the field of law enforcement
23 caught your attention?
24         THE DEFENSE:  Object to the form.
25         THE WITNESS:  Everything.  I mean, I like

Brian Columbus                                         November 13, 2024

Page 18

1  helping people.
2  Q.      (By Mr. Bryan)  Okay.  Anything else?
3  A.      No.
4  Q.      So how did this particular employment position
5  come to your attention?  Was it something you sought
6  out?  Did somebody show it to you?
7  A.      What particular position?
8  Q.      The first one.  Whatever the first time you
9  started law enforcement.
10 A.      I just saw that they were applying so I hired --
11 or saw that they were hiring so I applied.
12 Q.      Okay.  And who did you hire on with?
13 A.      Kickapoo Tribal Police.
14 Q.      In what capacity?
15 A.      Started out as a reserve.  I was a reserve for
16 just a couple of months and then I got hired on
17 full-time.
18 Q.      And then what were -- when you were hired on
19 full-time, what was your title?
20 A.      Patrolman.
21 Q.      And what were your job duties as a patrolman?
22 A.      To enforce state and tribal law.
23 Q.      Okay.  And what was your jurisdiction as tribal
24 officer?
25 A.      Three different counties.  All the tribal

1   jurisdiction in the counties.
2   Q.      In which three counties?
3   A.      Well, Pottawatomie, Lincoln, and Oklahoma.
4   Q.      Okay. And which tribe was it?
5   A.      Kickapoo.
6   Q.      Are you a member of the Kickapoo Tribe?
7   A.      No.
8   Q.      Did you become CLEET certified as part of that
9   employment?
10  A.      I became federally certified and then went to
11  CLEET for reciprocity.
12  Q.      And how do you become federally certified?
13  A.      Went to a federal police academy.
14  Q.      And where was that held?
15  A.      Artesia, New Mexico.
16  Q.      How long was it?
17  A.      17 weeks and two days.
18  Q.      And you were on-site?
19  A.      Yes.
20  Q.      What do you recall about that training?
21  A.      As far as what?
22  Q.      What did you cover?
23  A.      Everything.
24  Q.      Okay. Well, when you say everything, what do
25  you mean by that?

Brian Columbus                                                       November 13, 2024

Page 20

1        THE DEFENSE:  Object to the form.
2        THE WITNESS:  Tribal laws, you know, how to
3  handle different situations, arrest techniques, response
4  techniques, legal, everything.  Everything that pertains
5  to law enforcement, we covered.
6  Q.      (By Mr. Bryan)  Okay.  Did you cover
7  vehicle stops?
8  A.      Yes.
9  Q.      Did you cover vehicle pursuits?
10 A.      Yes.  Like I said, everything that pertains to
11 law enforcement.
12 Q.      Sure.  And I just -- I want to make sure that
13 we're on the same page.  Because if I say, you know,
14 diffusing bombs, did you do that?
15 A.      We learned how to handle.
16 Q.      Okay.  But did you learn how to diffuse them?
17 A.      No.
18 Q.      Okay. So not everything related to law
19 enforcement, right?
20 A.      Right.
21 Q.      Okay.  You learned how to execute a felony stop?
22 A.      Yes.
23 Q.      You took a legal block I imagine?
24 A.      Yes.
25 Q.      What did you learn in the legal block, or what

Page 22

1   wanting to focus on the Fourth Amendment, itself.  Not
2   necessarily, you know, other provisions of the
3   Constitution.
4   A.      Well, I don't remember that stuff off the top of
5   my head.
6   Q.      I'm sorry?
7   A.      I don't remember that stuff off the top of my
8   head.  It's been a few years.
9   Q.      Did you learn cases or did you learn concepts or
10  do you remember?
11  A.      We learned both.
12  Q.      Okay.  And when did you have that training?
13  A.      2013.
14  Q.      Okay.  Since 2013, what additional legal block
15  training have you had?
16  A.      Well, I had my -- my reciprocity through CLEET.
17  You had to take the legal block.
18  Q.      And when did you get your reciprocity?
19  A.      2014.
20  Q.      Since that time, have you had any additional
21  training that would be considered within the
22  legal block?
23  A.      I've been through other classes.  But I can't,
24  you know, off the top of my head recall what they were
25  or when they were.  Because I had continuing ed the

Brian Columbus                                    November 13, 2024

Page 39

1  or did you --
2  A.      No.
3  Q.      Did you go on patrol the next day?
4  A.      I don't remember.
5  Q.      Okay.  What -- do you remember anything else
6  about the onboarding process?
7  A.      Not really.  Just talked to the sheriff.
8  Q.      Okay.  Did you get a policy and
9  procedure manual?
10 A.      I don't recall.
11 Q.      Okay.  Did you receive any training?
12 A.      I mean, I talked to some other deputies.  You
13 know, they told me different things.  They told me, you
14 know, what the sheriff expected and things like that.
15         I went and drove around for about the first week
16 that I was there just trying to learn the area better.
17 And then, you know, like I would shadow a deputy, you
18 know, just to see how they work compared to what I was
19 used to.
20 Q.      Okay.  Anything else that you can remember about
21 the onboarding process?
22 A.      I don't remember.
23 Q.      Okay.  Tell me about what -- you mentioned kind
24 of the expectations of Sheriff Hedgecock.
25         What do you recall those expectations being?

1   A.     The best I can remember, he just wanted all the
2   drugs off the streets.  He wanted all the drugs out of
3   the county.
4   Q.     Okay.  And other than kind of that, you know,
5   statement, was there any instruction given on how to
6   execute on that plan?
7   A.     No.  No.  Like I said, I was just shadowing
8   those guys to see how they did things and go from there.
9   Q.     Okay.  Do you recall the name of anybody that
10  you shadowed?
11  A.     No.  I mean, I followed different people.  You
12  know, like, I followed Steely, I followed Dillan, and I
13  guess followed Valentine.  That's all I can think of.
14  Q.     Okay.  And when you went on patrol, would you
15  usually be alone or would you go with another deputy?
16  A.     Whenever I first started out, there were three
17  of us on shift at the same time.  You know, like one of
18  us would be up north, the other two be down south, or
19  vice versa.
20  Q.     Okay.  And on the night of the 30th, you were
21  with Knoll, right?
22  A.     So I was by myself for most of the night.  And
23  then it got late and there really wasn't anything going
24  on, so me and Knoll decided to ride two-man that night.
25  Q.     Okay.  Did you have to get authority to do that

Page 71

1  Q.     Do you know if any of those bags were ever
2  recovered?
3  A.     Not to my knowledge.
4  Q.     Did your agency place a priority on -- not your
5  agency, but Push County.  Did they put a priority on
6  finding that?
7         THE DEFENSE:  Object to the form.
8         THE WITNESS:  I know whenever we left the scene
9  that morning, like, we went down the road and we -- we
10 looked.  But I mean, we couldn't see anything.  Because
11 I mean, obviously, I got hit by a car so I couldn't
12 remember exactly where it was at.  And I guess Knoll
13 couldn't remember either.  And that was -- that was
14 hours prior.  You know what I mean?
15 Q.     (By Mr. Bryan)  Right.  Okay.
16        Is it fair to say that the search was just
17 abandoned that morning?
18 A.     I don't know.
19 Q.     Okay.  But your -- you were no longer involved
20 at that point?
21 A.     No.
22 Q.     Okay.  Do you know who would have been the
23 person responsible at that point?
24 A.     I don't have a clue.
25 Q.     Any other conversations that you can remember?

Page 73

1  A.      Are you talking about after the shooting?  Or
2  before?
3  Q.      This is before.
4  A.      No, it never came to a complete stop.
5  Q.      Okay.  It was always moving?
6  A.      Yes.
7  Q.      Okay.  And so when you guys were approaching and
8  his car had I guess slowed to a roll, is that fair?
9  A.      Yes.
10 Q.      What was the plan?  Did you have one?
11 A.      No.
12 Q.      What did your training tell you to do in
13 that circumstance?
14 A.      So everything that I've always done, all the
15 training, is just stop -- stop the situation, you know.
16         And because Knoll was the driver, I wasn't going
17 to go in between, you know, the patrol car and his car
18 just from training aspects.  You know, if you do that, I
19 mean, it can be thrown in reverse and ran over you.  So
20 I went to the passenger, the passenger side of the car,
21 to get Tammy out of the car.
22         As far as what Knoll had going on, I don't know.
23 I assume that he was trying to get Miller out of the car
24 as well so...
25 Q.      Okay.  Have you ever heard of a felony stop?

1  A.    But like I said, I mean, different situations
2  call for different things.  You know what I mean?
3  Q.    Okay.  So just so the record's clear though, you
4  don't recall receiving any training on removing somebody
5  from a moving vehicle.  Is that fair?
6  A.    Correct.
7  Q.    Okay.  So as you approached the car, what are
8  you observing?
9  A.    Well, whenever I was going up to the car, I was
10 making sure that there's no guns hanging out anywhere.
11 Q.    Okay.  And you didn't see any, right?
12 A.    I mean, it all happened in seconds and it was
13 dark.  You know, not -- it didn't look like there was
14 anything.
15 Q.    Okay.  And you approached the passenger
16 door, right?
17 A.    Correct.
18 Q.    And what do you do at that point?
19 A.    So I tried to open the door.  I don't remember
20 if I got it open the first time or I had to pull a
21 second time.  And I got that -- I got it open.
22       And I grabbed Tammy and went to pull her out.
23 Well, she jerked away from me.  And I just reached back
24 in to grab her and pull her out.
25 Q.    Okay.  And is the car moving?

Page 91

1   forward to try to reach back in.
2   Q.      Okay.  And so you turn around or turn back
3   towards the passenger door, that pocket.  Right?
4   A.      Correct.
5   Q.      And you take a step forward to get back into
6   the pocket?
7   A.      Yes.
8   Q.      Okay.  You take a step forward to get back into
9   the pocket and then you are going back to reach into the
10  cabin of the vehicle.  Is that right?
11  A.      Correct.
12  Q.      All right.  And do you actually get your arm in
13  or do you get any part of your body in?
14  A.      I don't remember.  Like, I don't remember.  I
15  just know I was reaching and then the car lunged
16  forward.
17  Q.      Okay.
18  A.      There wasn't just like a -- like a little slow
19  move.  It lunged.
20  Q.      Okay.  So you're reaching in, and all of a
21  sudden the car jumps -- lurches forward?
22  A.      Correct.
23  Q.      And at this point then, is Tammy Scott
24  behind you?
25  A.      No.  I think she's still beside me over there.

1  Q.     Right.  I mean, I'm not a biomechanical
2  engineer.  I mean, you and I could, you know, sit down
3  and we could, like, you know, talk about, you know,
4  physics and how these things.  But that doesn't
5  necessarily mean we're going to be right about it.
6         So that's why I'm asking you.  And it sounds to
7  me like this is your best guess based upon your personal
8  knowledge, but you can't testify that this is, yes, this
9  is exactly what happened.
10        THE DEFENSE:  Object to the form.
11 Q.     (By Mr. Bryan)  Is that fair?
12 A.     No, I know I was hit by the door.
13 Q.     Right.  But you -- what I'm asking you is which
14 part of the door?  Like, how did it happen?
15 A.     The best -- the best guess is the edge of the
16 door is what hit me.
17 Q.     Okay.  But that's a guess, right?
18        THE DEFENSE:  Object to the form.
19        THE WITNESS:  Nothing else is going to leave a
20 cut like that.
21 Q.     (By Mr. Bryan)  Say that again.
22 A.     There would be nothing else that would leave a
23 cut like that.
24 Q.     Right.  But that's our guess, right?
25        THE DEFENSE:  Same.

Brian Columbus                                        November 13, 2024

Page 100

```
1    A.      Yes.
2    Q.      Okay.  And do you fall to the ground at
3    that point?
4    A.      Like I stated earlier, you know, I went to my
5    back or I did a somersault or something.  I felt like I
6    did a back somersault.
7    Q.      Okay.  So -- and the car is still going
8    backwards or did it stop when it hit you?
9    A.      I want to feel like that it kept coming
10   backwards.  Because whenever it started going forwards,
11   like, I was having to get out of the way because the
12   rear tire was going to run over us.
13   Q.      Okay.  So you get hit by the door and the car is
14   still moving backwards?
15   A.      I can't say yes or no to that.
16           But I mean, like I said, whenever the car
17   started going back forwards, like, we were going to get
18   ran over by the back tire.
19   Q.      Okay.  And so you get hit, you're not sure if
20   the car is continuing to go back.  But at some point, it
21   starts to go forward again?
22   A.      Correct.
23   Q.      Okay.  And where are you in relationship to
24   the car?  Like, at what point along the side of the car
25   are you when the car starts to move forward again?
```

```
 1              THE WITNESS:  Yes.
 2    Q.        (By Mr. Poe)  Now, you did not use any deadly
 3    force this night, correct?
 4    A.        Correct.
 5    Q.        You did use force -- would you consider that --
 6    that you used force in getting Ms. Scott out of the car?
 7    A.        Yes.
 8    Q.        You were asked -- now, by Counsel about how to
 9    extricate someone from the car, you were trained about
10    extricating someone from the car while it was moving,
11    and he kept saying, "While it was moving."
12              And I believe you said you don't recall if you
13    were or not.  Was that correct?
14    A.        Correct.
15    Q.        Now, during your training that you received, you
16    received that at the Federal Law Enforcement Training
17    Center.  Is that correct?
18    A.        Correct.
19    Q.        As far as that training, were you trained in
20    traffic stops?
21    A.        Yes.
22    Q.        And were you trained in how to remove someone
23    from a car during a traffic stop if you needed to get
24    them out of the car?
25    A.        Yes.
```

Page 136

1  Q.      So at the time that you actually got Ms. Scott
2  out of the car and tried to -- are you sure the car was
3  still moving or wasn't moving at that split second?  Or
4  you just don't know?
5  A.      I don't know.
6  Q.      And if it was moving, was it just -- when you
7  tried to extricate her, was it just barely moving or was
8  it going 30 miles an hour?
9  A.      It was barely moving.
10 Q.      Okay.  And you certainly were trained on how to
11 try and get someone out of a car in a situation
12 like that?
13 A.      Absolutely.
14 Q.      The training you received at the
15 Pushmataha County Sheriff's Office, you said that you
16 shadowed some officers or shadowed deputies for at least
17 some time period?
18 A.      Maybe and week, week-and-a-half, something
19 like that.
20 Q.      And at some point, did they shadow you or they
21 said, "You're trained, you've been an officer for a
22 while, now that you know what we do here at the county,
23 you can go on?"
24 A.      Correct.  They just let me go out there.
25 Q.      At the time that you were hired, you had been

Page 137

1    trained by FLETC--
2    A.      Yes.
3    Q.      -- and been certified as a law enforcement
4    officer, correct?
5    A.      Yes.
6    Q.      And you had been -- done the -- done this at --
7    academy but the legal block that's required by Oklahoma
8    to get Oklahoma certification.  Is that correct?
9    A.      Yes.
10   Q.      And they accepted your FLETC training for your
11   CLEET certification, with the addition of that Oklahoma
12   block, correct?
13   A.      Correct.
14   Q.      And Mr. Bryan asked you about whether eluding
15   was a felony or a misdemeanor, and you said you thought
16   it was a felony but not sure where you got that.
17           Do you recall that testimony?
18   A.      I do.
19   Q.      Okay.  And during the legal block that was
20   provided by CLEET, did they go over state laws such as
21   what crimes were, what level of crime might be, such as
22   eluding or something like that?
23   A.      I don't -- I don't remember.
24   Q.      Okay.  In relation to getting Ms. Scott out of
25   the car, there's been testimony that you pulled her hair

Brian Columbus                                          November 13, 2024

Page 139

1   one back.  Is that correct?
2   A.      Correct.
3   Q.      As far as you know, you don't know why it
4   wouldn't work with you?  But your understanding at least
5   they looked at it and thought they had it working each
6   time they gave it back to you.  Is that correct?
7   A.      Correct.
8   Q.      Earlier that day, had you tested the body cam to
9   see if it had been working if it was working?
10  A.      I had no way to look at the video, so I wouldn't
11  know if it was working or not.  I mean, any call that I
12  went on or any traffic stop I made that day, I was --
13  you know, went through the steps for it to turn on, you
14  know.  I don't know if it did or not.  Like, it made the
15  audible beep, but it -- that was it.
16  Q.      Okay.  You don't think it was intentional of the
17  sheriff's office to give you a defective camera so you
18  would never be able to record anything, do you?
19  A.      No.
20  Q.      At FLETC, were you trained on what the standard
21  is for appropriate use of force?
22  A.      Yes.
23  Q.      And that would include deadly force, correct?
24  A.      Correct.
25  Q.      And that would include the force of trying to

Page 140

1   secure a scene, such as this one, when a car has fled
2   and you're trying to get the people under control,
3   correct?
4   A.      Correct.
5   Q.      And do you think the force you used with
6   Ms. Scott in trying to get her out of the car was
7   reasonable?
8   A.      Yes.
9           MR. BRYAN:  Object to form.
10  Q.      (By Mr. Poe)  It was reasonable based on what
11  you observed and what you thought at the time, correct?
12  A.      Correct.
13  Q.      One thing -- one of the questions about your
14  memory of this incident, and if I understand your
15  testimony, were you trying to tell Mr. Bryan that the
16  things you told him today are things you remember, and
17  when you said, "I don't remember," then that's the
18  things you did not remember?
19  A.      Correct.
20  Q.      So as far as testifying from memory, the things
21  you testified -- you said, "Yes, this is what I
22  remember," that's from your memory?
23  A.      Correct.
24  Q.      I'm going to show you -- there was some
25  questions about your application.  Let me pull that up.