IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

DAN MILLER, as Special Administrator of the ESTATE OF HANK MILLER, Deceased, TAMMY SCOTT, an individual,

    Plaintiffs,

vs.                             Case No. CIV-22-164-RAW

B.J. HEDGECOCK, in his official capacity as Sheriff of Pushmataha County, State of Oklahoma, et al.,

    Defendants.

REMOTE STREAMING DEPOSITION OF

GLENN A. WALP, PhD.

TAKEN ON

MONDAY, NOVEMBER 25, 2024

9:06 A.M.

4798 SOUTH LAS MANANITAS TRAIL

GOLD CANYON, ARIZONA 85118

**EXHIBIT 6**

1   there are more that I plan to submit on a
2   supplemental.
3       Q.   Which ones are those?
4       A.   That's like I said, I don't know without
5   going through my stacks of paper here.  I got them
6   everywhere.  But you'll be receiving it shortly.  By
7   shortly, I mean, within the appropriate time frame.
8       Q.   Have you read to present day Tammy Scott's
9   deposition?
10      A.   Tammy.  Tammy.  I don't think I read -- I
11  don't think she had a deposition.  I don't -- I
12  don't remember her deposition.
13      Q.   I've not seen that on your expert report
14  materials.  So, you have no reason to think that you
15  did read that deposition?
16      A.   No.  To the best of my recollection, what
17  I have from Tammy is, of course, what she said on
18  the body cams and also what she told OSBI.  But to
19  the best of my recollection, I did not review a
20  deposition of Ms. Scott.
21      Q.   Have you talked to Tammy Scott at any
22  point throughout this litigation?
23      A.   No.
24      Q.   Have you read Brian Columbus' deposition?
25      A.   I have.

1   -- that would be my recollection.
2       **Q.**   Hank Miller, himself, did not turn the
3   vehicle off, right?
4       **A.**   I don't think so.
5       **Q.**   Going down, sir, a couple of lines.
6   Although Knoll had his AXON lapel camera on, it
7   wasn't easy to understand the exact conversation
8   between Miller and Knoll at that point.  Did I read
9   that correctly?
10      **A.**   That's correct.
11      **Q.**   You would grant that you couldn't hear
12  everything spoken by Knoll during that stretch of
13  time, right?
14      **A.**   I -- I could not make it out with
15  specificity.  No.  It just sounded like verbiage
16  going back and forth or whatever, but I could not
17  really understand it.
18      **Q.**   But do you acknowledge that Knoll was
19  ordering Miller to stop the vehicle during that time
20  period?
21          MR. TERRILL:  Object to form.
22          THE DEPONENT:  All I know is Knoll said
23  that's what he said to him.  Unfortunately,
24  according to Columbus, he says, I couldn't hear it
25  either.  And so I don't know.

1  BY MR. SMITH:
2      Q.   And after that audio that you couldn't
3  hear fully, you do admit that the car moved forward
4  during those ensuing seconds?
5      A.   Yes.
6      Q.   Did you ever hear Miller say stop yelling
7  to Knoll?
8      A.   I -- I could hear what appeared to be
9  coming from Miller verbiage, but I could not
10 understand what he was saying.  All I know is what
11 Knoll said he was saying.
12     Q.   Want to go down to the next page, sir.
13 Under the forward, my understanding is that you were
14 provided a summary of both Knoll and Steely's lapel
15 camera video; is that right?
16     A.   No.  I don't remember receiving a summary,
17 no.
18     Q.   Excuse me.  Did you receive a
19 transcription of both Knoll and Steely's body cam
20 videos?
21     A.   That, I did.
22     Q.   I just wanted to clarify that.  You can go
23 down to miscellaneous issues section.  This is on
24 Page 11 of your September report.  Down here, you
25 see, sir, about two thirds of the way down.  It

1  woodsy, not thick woods, but some sort of woodsy on
2  the left as Knoll was running up.
3       And then just -- just sort of a road, and
4  it had some high weeds in front of it.  And then
5  there was some kind of piece of equipment, I think,
6  a mowing equipment that wasn't too far.  And when it
7  ended up, it was very close to the mowing machine.
8  So, yeah, there was space, though, to run up to.
9  It's not like Knoll had to run through the woods.
10      **Q.**  And when you say left of the vehicle, are
11 you talking about driver's side of the vehicle?
12      **A.**  Yeah.  Left side would be the driver's
13 vehicle.
14      **Q.**  Do you -- do you see any lights on the
15 land itself other than that emanating from behind
16 the vehicle?
17      **A.**  No.  I didn't see any other lights, no.
18           MR. SMITH:  This is Exhibit 4, this photo.
19           THE REPORTER:  Exhibit 4.
20           (WHEREUPON, Exhibit 4 was marked for
21 identification.)
22 BY MR. SMITH:
23      **Q.**  You just described what you remember being
24 to the left of the vehicle.  Does that kind of
25 refresh your memory?

GLENN WALP, PHD                November 25, 2024
80138

Page 198

1    **A.**   Yeah, that's it's final resting place.
2    **Q.**   And you see brush that is a few feet away
3    from the driver's side door of the vehicle.
4    **A.**   I do.
5    **Q.**   And you mentioned the equipment.  Is this
6    what you were referring to?
7    **A.**   Yeah.  And I think there's another piece
8    of equipment right in front of the vehicle too.  If
9    I remember correctly, but I may be wrong.  But I
10   remember that, but I remember something in front of
11   it.
12   **Q.**   And so we have -- you mentioned woodsy and
13   brush to the side of the vehicle, correct?
14   **A.**   That would be -- that would be correct.
15   But as I indicated, where Knoll ran up to the
16   vehicle, there was space between that brushy part
17   and that he could run up to the car and grabbed it
18   by the rear view mirror.
19   **Q.**   And you would agree, looking at this
20   Exhibit 4, if Miller gets out of the vehicle on his
21   own land and runs just a few steps to the left, he's
22   encased in the brush area at that point, right?
23   **A.**   He could have been, had he done that.
24   Sure.
25   **Q.**   So, if the patrol vehicle is a significant

1       A.    In that one scene, yes.
2       Q.    How long did that one scene last?  A
3   second?
4       A.    Not a second.  It was a -- I didn't time
5   it, but it was a couple of seconds.  It wasn't fast.
6   And I -- I'm just guessing.  Maybe five, six, seven,
7   eight, maybe ten seconds.
8             I don't know.  But it wasn't a flash.
9       Q.    So, your testimony in sum is that the
10  officers didn't do enough to be certain that Miller
11  was dead, right?
12      A.    No.  It's not that they didn't do enough.
13  They didn't do anything.
14      Q.    And by anything, you mean, give CPR,
15  provide any active assistance?
16      A.    Yeah.  Didn't -- didn't do anything.
17  Didn't do anything.
18      Q.    Let's see.  Top of this page, sir, the
19  first paragraph, no matter the circumstances, police
20  officers are trained to administer first aid to
21  whoever needs it.  Did I read that right?
22      A.    That is correct, sir.
23      Q.    What do you mean by whoever needs it?
24      A.    In other words, a police officer is
25  trained and they both -- all had first aid training,

1   that your job is, if you will, to protect and serve.
2   And even if it's the person you may have just shot,
3   you still try to protect them and try to save their
4   life if you can.  It doesn't -- just because
5   someone's bad, or evil, or whatever.  If you have
6   the opportunity, you try to preserve life under any
7   circumstance.  That's first aid by first responders.
8           That's -- that's number one.  Once
9   everything is contained and controlled, make sure
10  everybody's okay, and that means everybody.  That's
11  how you're trained.
12      **Q.**   But you have encountered situations
13  perhaps personally or through articles and education
14  that someone instantly dies at the scene, correct?
15      **A.**   It can happen.  That's true.
16      **Q.**   And in that scenario, an individual who's
17  instantly died at the scene, do they need CPR?
18      **A.**   Well, I drove up the crime -- or not a
19  crime scene, a traffic scene, and they had a piece
20  of steel going right through their brain.  I assumed
21  they were dead, and they were.  But absent that,
22  that type of brutal scene, you try to save life, and
23  they had no idea.  They had no idea if he was
24  breathing or not.
25      **Q.**   The next sentence, after Knoll shoots

1  Q. That has nothing to do with resorting to
2  training in hectic moments?
3  A. I apologize. I'm not sure what you're
4  saying there. What?
5  Q. You think that an officer would never
6  resort to training in hectic moments, and that it
7  would always be a conscious assessment of the
8  individual?
9      MR. TERRILL: Object to form.
10     THE DEPONENT: All I know is they were
11 trained in first aid. You're a first responder.
12 You're trained to deal with stress. And -- and they
13 failed. They -- they failed, and if -- that's all I
14 can tell you. They failed in doing their duty.
15 BY MR. SMITH:
16 Q. The next page, first paragraph, we've
17 already discussed this briefly. I just want to
18 touch on it and move on.
19 A. All right.
20 Q. Right hand and fingers of Miller can be
21 seen moving, indicating I opine that Miller was
22 alive. Did I read that correctly?
23 A. Yes.
24 Q. Is that the only basis you have for
25 believing that Miller was alive at that point?

GLENN WALP, PHD                 November 25, 2024
80138

Page 281

```
 1   it, obviously, as you indicate, rests with the trier
 2   of the facts.  But that's my position on it.
 3        Q.   Number four, is it your position that even
 4   if the officers were subjectively certain that
 5   Miller was dead, they had to administer CPR under
 6   the law?
 7        A.   Hit me again, please.
 8        Q.   Yeah.  Is it your expert position that
 9   even if the officers were subjectively certain that
10   Miller was dead, they, nonetheless, had a duty to
11   administer CPR under the law?
12             MR. TERRILL:  Object to form.
13             THE DEPONENT:  By -- by their training.
14   They had -- it was inconsistent with best police
15   practices and common professional police training.
16   And I know how they were trained in first aid, and
17   you try to save and preserve life, and the point
18   that they did nothing. They did nothing.  Did not
19   align with -- well, you moved it down.  I can't see
20   what's happening.
21             MR. SMITH:  Oh, sorry.
22             THE DEPONENT:  The proper law enforcement
23   conduct of Knoll, Columbus, and Steely.  It's just a
24   fail.  It was a total failure.  And -- and I'm very
25   clear.  I think it was incomprehensible.  I think it
```

1    **A.**    That one probably does.
2    **Q.**    Okay. Same thing with the deposition of
3    Sheriff Hedgecock, 59.
4    **A.**    Okay.
5    **Q.**    Number 60, and I think that goes back to
6    even maybe similar to what number 24 is, basic
7    training at K.O. Rayburn Center. What did that
8    information provide to you that's relevant to any of
9    your opinions today?
10   **A.**    Yeah, this was, like, sort of the same
11   information that I had. It just outlined, you know,
12   one of the ones I wanted to evaluate is their first
13   aid training. Did they receive first aid training?
14   And in both cases, both Knoll and Columbus had
15   received first aid training. And that -- that was
16   my main reasoning for grabbing that information.
17   **Q.**    Did the CLEET records also -- or the
18   information you saw, also indicate training on
19   traffic stops?
20   **A.**    What I'm looking at there, this was just
21   what was in their basic academy. And CLEET didn't
22   really have a whole lot. Rayburn -- or excuse me.
23   They didn't have a whole lot, but I -- I pulled off
24   what I could. And --
25   **Q.**    Let me ask you this way. Did the

1   that --
2       A.   I have.
3       Q.   -- on that list?  Okay.  So, that list is
4   not really reliable.
5       A.   I -- I would say it's not reliable in my
6   opinion.
7       Q.   All right.  And then 72 -- or 71 and 72,
8   we haven't seen.  If you'll add those in.
9       A.   You want 71 and 72?
10      Q.   Yes -- yes, sir.  So, we'll know what you
11  have been referencing.
12      A.   The CALEA standards, I think I had already
13  submitted those.
14      Q.   Well, it says you looked them up in
15  October of 2024.  It looks like.  Or maybe -- there
16  may be some others you had, but I'm thinking these
17  are the newer ones.
18      A.   Could be.  If you want them, I'll see that
19  you get.
20      Q.   Please, sir.  Thank you.
21      A.   You're welcome.
22      Q.   You mentioned the first aid issue that you
23  had searched to make sure those officers were
24  trained or had received training on first aid, did
25  that include training on the requirement to render

1   first aid to a suspect or anybody else who is down,
2   who is injured, as a result of an action?
3      **A.**   I think that's twofold.  And in answer to
4   your question, first aid is more regarding how to
5   give first aid.  How to aid someone who may be in
6   distress, as it may deal with -- just like in this
7   case, a shooting, an accident.  We are first
8   responders, and as you well know, the law in
9   Oklahoma, the Good Samaritan Act, they're allowed to
10  do it without fear of being sued.  And so that is
11  more the first aid process.
12           The idea that you serve people, that's
13  more or less what you're trained as regarding your
14  code of conduct, perhaps your oath of office, that
15  what you will do and preserve life and the
16  protection of life and property.  And it's
17  axiomatic.  If you're a law enforcement officer, and
18  you encounter any situation, whether you're on duty
19  or off duty, you take action to try to save life.
20  And --
21     **Q.**   Whether that -- whether the injury is
22  caused by someone else or caused by you, the officer
23  --
24     **A.**   That's correct.  Correct.  At any time,
25  yes.

GLENN WALP, PHD                 November 25, 2024
80138

Page 331

1    Q.   And you don't have any doubt --
2         THE REPORTER:  Just a reminder, have full
3    sentences, full questions, full answers, please.
4    BY MR. POE:
5    Q.   You don't have any doubt that the three
6    officers involved in this case were trained to
7    render aid in -- under such circumstances?
8    A.   I -- I very -- in my mind's eye, I am very
9    clear that they all received that training.
10   Q.   Okay.  So, I don't want to take a lot of
11   time because I know we've been at it.  And Steve,
12   I'm going to try and run through these opinions
13   pretty quick.  Okay.  We on -- do you see that, Dr.
14   Walp, that looks like paragraph number two?
15   A.   Not right now.  It's to the bottom of my
16   screen.
17   Q.   Okay.  Okay.  I want to make sure that --
18   there.  Okay.  It looks like this is really the
19   first entry about Sheriff Hedgecock and the
20   Sheriff's Office.
21        And you are critical of -- are you
22   critical here of Sheriff Hedgecock not running a --
23   or not conducting an internal affairs investigation
24   into the incident?
25   A.   I am.

1    of -- if in Arizona, this would have been not --
2    it's not that they weren't properly trained, it
3    would have been they willfully violated that
4    training?
5        A.    I don't know.
6        Q.    Okay.
7        A.    I don't know because I don't know what
8    they were trained.  I -- I know they may have had
9    the topic, but was it -- did they act this way
10   because they weren't appropriately trained, or were
11   they acting because they willfully violated that
12   training?  I don't know.  I have no idea.
13       Q.    Let's go to, I think, the next comment --
14   it's 33 -- looks like the next I want to address,
15   Dr. Walp, is the first aid issue.  And if I
16   understand you right -- correct, you believe they
17   were actually trained, that they knew it was their
18   duty and requirement to at least try to render first
19   aid if it was appropriate?
20       A.    That they were appropriately trained?  Is
21   that your question?
22       Q.    Yes.
23       A.    Yes.  I believe they were appropriately
24   trained, yes.
25       Q.    Now, as far as the Sheriff's Office

1  policy, I believe you actually have noted in here
2  that one of the commanders, when they called in,
3  directed the officers to try first aid, make sure
4  that they provided aid to him if -- is that correct?
5      A.   He -- he directed him to make sure -- he
6  asked him, is he -- make sure he's not bleeding out.
7  And that's when Steely said, hey, we got to take him
8  out, and then he says, well, he's 30.  He's probably
9  30, maybe he's 30.  He had no idea, and sort of
10 running around with the proverbial chicken with his
11 head cut off.
12     Q.   Well, I think the language you quote the
13 commander actually told him to look at him and see
14 if they can do anything to keep him from bleeding
15 out.
16     A.   Yeah.  And are you sure he's signal 30?
17 And that's when it --
18     Q.   And that's certainly be a -- been the
19 Sheriff's Office, or at least the commander was
20 telling them to do what you can do to render aid
21 that needs to be rendered.
22     A.   That is -- that is a correct statement.
23     Q.   And that would be an appropriate action by
24 the Sheriff's Office staff, correct?
25     A.   That would be correct.

GLENN WALP, PHD                      November 25, 2024
80138

Page 364

```
 1    time when you were with the Pennsylvania State
 2    Police?
 3         A.    Never.
 4         Q.    Boy, you got to be one of the few.  Most
 5    of them --
 6         A.    It's in the record book.
 7         Q.    Yeah.  But you never had -- you never
 8    aware of an officer saying, I'll take my oral
 9    reprimand, oral warning just so I can go do
10    something.  I go on and forget about it.  It's
11    easier to do that than it is to fight it?
12         A.    I have never encountered that in all the
13    discipline I issued out.
14         Q.    All right.  I want to go to page -- the --
15    your final opinions.  I know we've already discussed
16    number one with Mr. Smith, number two with Mr.
17    Smith.  Number three with Mr. Smith.  I believe we
18    address number four with Mr. Smith.  Number five, as
19    far as the failure to administer aid, you are
20    critical of those officers for not administering
21    aid, but not critical of the Sheriff's Office --
22         A.    No.
23         Q.    -- to provide aid, correct?
24         A.    I -- I am critical of the officers not
25    administering first aid.  Yes.
```

1   **Q.**   Okay. But the direction by -- by the
2   supervisor on the phone was a correct action and a
3   correct directive for those officers that they
4   should have followed, correct?
5   **A.**   That is correct.
6   **Q.**   Okay. As far as number six, Dr. Walp,
7   concerns over Officer Knoll's fitness, have we
8   addressed everything? Have we addressed all of your
9   opinions regarding to that particular opinion?
10  **A.**   I would agree we covered that pretty well.
11  **Q.**   Okay. Now, the catch-all of number seven
12  says, numerous failures in leadership, including but
13  not limited to inadequate training of department
14  personnel.
15            And that goes back to because they didn't
16  -- you didn't bring them in and set them down --
17  **A.**   What was the question, sir?
18  **Q.**   Well, is that the lack of training because
19  the sheriff didn't bring them in and say, we need
20  more training on this?
21            And by doing that, are you discounting
22  what their training was in that extended academy
23  that each of them went through?
24  **A.**   Yeah. I'll just pick one. Every police
25  department has their own policy. And he had a