Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

DAN MILLER, AS SPECIAL )
ADMINISTRATOR FOR THE ESTATE )
OF HANK MILLER, DECEASED, )
　　　　　　　　　　　　　　　　)
　　Plaintiff, )
　　　　　　　　　　　　　　　　)
　　　-vs- ) No. 22-cv-164-RAW
　　　　　　　　　　　　　　　　)
B.J. HEDGECOCK, IN HIS )
OFFICIAL CAPACITY AS SHERIFF )
OF PUSHMATAHA COUNTY, STATE )
OF OKLAHOMA; ET AL., )
　　　　　　　　　　　　　　　　)
　　Defendants )

VIDEOCONFERENCE DEPOSITION OF DUSTIN BRAY
TAKEN ON BEHALF OF THE PLAINTIFF
ON DECEMBER 3, 2024

REPORTED BY:　MARTA MATTINGLY, CSR, RMR

**EXHIBIT 14**

Page 40

1  without one?
2      A   The ones that I know of usually turned in an
3  application.
4      Q   Walk me through this process, how you would
5  receive or how you would hire someone on?
6      A   Are you asking me specifically?
7      Q   Right.  I am talking about, what were your job
8  duties in the context of the hiring process back when
9  you were undersheriff in 2021?
10     A   Honestly, back then, I wasn't really involved
11 with the hiring process, to my recollection.
12     Q   Explain for me your understanding of the
13 hiring process back in 2021 when you were hired on or
14 when you took the role of undersheriff?
15     A   Again, interview, background check, I could
16 check references.
17     Q   Anything else?
18     A   Not that I can think of.
19     Q   Interview, background check, and sometimes
20 references?
21     A   Yes.
22     Q   In terms of the interview portion of this, did
23 you have any specific questions or a script that you
24 would rely on?
25     A   Not generally, no.

Page 41

1   Q   Were there any specific topics or categories
2   that you would ask about?
3   A   Me, personally, family, life, hobbies, things
4   outside of work, you know, things about the job they
5   like, what their interest is as far as the job.
6   Q   Anything else that you can think of?
7           MR. POE:  Object to the form.
8           Go ahead.
9           THE WITNESS:  Just explain to them what
10  being a deputy entailed.
11  Q   (By Mr. Bryan)  You said you would also do a
12  background check.  Tell me about that?
13  A   It would be fingerprints through OSBI and
14  criminal histories.
15  Q   How do you do the criminal history?
16  A   Run what we call a Triple I.
17  Q   Fingerprints, criminal history.  Anything
18  else?
19  A   As far as the background check, that's most of
20  what we do.
21  Q   Then you say sometimes you would also check
22  references; correct?
23  A   Correct.
24  Q   Would there be any particular reason why you
25  may or may not check a reference?

1   A   It would depend on the reference.
2   Q   Explain that for me?
3   A   Well, whether it be from an employer or
4   references from another officer or from even another
5   agency.
6   Q   Would there be some references you would be
7   more inclined to reach out to than others?
8   A   Just a case-by-case basis.
9   Q   Did you have any written guidance or
10  guidelines or protocols or written policies that your
11  agency either had expressly adopted or just informally
12  relied on on how to navigate an applicant through the
13  preemployment process?
14  A   Do you mean prior to employment or after
15  employment?
16  Q   Preemployment.  And what I'm speaking to more
17  specifically is things that would guide the people
18  responsible for the hiring of the applicant?
19  A   If we had any -- are you asking if we have
20  like a policy in place through that or we just --
21  Q   Yeah.  I think probably, in its most basic
22  terms, there's policy, then there's kind of practice.
23  You know, policy is kind of the written word and
24  practice is kind of how we do things.  That's kind of
25  what I'm looking at.

1        Did you have either a written guidance on how
2   to go through the hiring process or did you have any
3   type of informal way of kind of doing things?
4            MR. POE:  Object to the form.
5            Go ahead.
6        Q   (By Mr. Bryan)  Does that make sense?
7        A   I would say more -- I don't specifically know
8   policy of that, but I would say more practice.
9        Q   I am going to show you some things that have
10  been produced in this litigation, see if you can help me
11  identify some of this stuff.  Can you see my screen, Mr.
12  Bray?
13       A   Yes, sir.
14       Q   This was recently produced to us.  Can you
15  identify it for the record?
16       A   Yeah.  It's our drug and alcohol testing
17  policy.
18       Q   Was this in effect in 2021?
19       A   I believe so.
20       Q   And would this apply in both the pre and post
21  employment period?
22           MR. POE:  Object to the form.
23           If you know.
24           THE WITNESS:  I'm not sure if it was.
25       Q   (By Mr. Bryan)  Did you rely on this in making

Page 44

1  your hiring decisions?
2      A    That is our county's policy.  It's in the hire
3  packet.
4      Q    And this is something that you would have had
5  back when you started as undersheriff in 2021; correct?
6      A    I believe so.
7      Q    I will just mark this as Exhibit 1.
8              (Exhibit Number 1 marked for
9              identification but not produced)
10             MR. BRYAN:  And it is DDR 10 007 through
11 DDR 10 014.
12             MR. POE:  What are those again?
13             MR. BRYAN:  DDR 10, 7 through 14.
14             MR. POE:  If you want to see the
15 documents, ask him to show you.
16     Q    (By Mr. Bryan)  Mr. Bray, do you see my
17 screen?
18     A    Yes.
19     Q    What are we looking at here?
20     A    That's a drug and alcohol testing consent
21 form.
22     Q    Is this part of that drug and alcohol policy?
23     A    I believe that's part of their employee
24 packet, as well.
25     Q    And what are these -- why are these included

1   in the employee packet?
2       A    Is there anything below that or is that the
3   complete form?
4       Q    That's the complete form.
5       A    I believe that's for the random drug test.
6       Q    Are there different consent forms for
7   different types of drug tests?
8       A    I don't see the forms.  We just get called for
9   randoms, and some will be drug and alcohol, some will be
10  just drug.
11      Q    Okay.  So would you do a consent form for a
12  new hire, pre-application drug screen?
13      A    The preemployment paperwork is done with the
14  county clerk.
15      Q    Do the preemployment drug screens also include
16  this consent form?
17      A    I think so.
18      Q    So if somebody was hired on with Push County,
19  you would expect that there's one of these consent forms
20  somewhere for that individual?
21      A    Yes; because I think that's from their
22  employment packet.
23      Q    Okay.
24           MR. BRYAN:  This is DDR 10 025.
25           MR. POE:  Are you going to make that

```
 1   Exhibit 2?
 2              MR. BRYAN:  Yeah.
 3              (Exhibit Number 2 marked for
 4              identification but not produced)
 5       Q    (By Mr. Bryan)  What role does the employment
 6   application play in the hiring process?
 7       A    Just their personal information, employment
 8   history, references.
 9       Q    You said you sometimes would call references.
10   Would you ever call former employers?
11       A    Yes.  Again, it would be a case-by-case basis.
12       Q    When you would call employers or references,
13   did you take notes of those conversations?
14              MR. POE:  Object to the form.
15              Go ahead.
16              THE WITNESS:  I did not, no.
17       Q    (By Mr. Bryan)  Did you record or memorialize
18   that conversation in any way?
19              MR. POE:  Object to the form.
20              Go ahead.  You can answer.
21              THE WITNESS:  No.
22              MR. POE:  Dustin, for the record, when I
23   object, unless I tell you not to answer, you have to go
24   ahead and answer.
25              THE WITNESS:  Okay.
```

Page 47

1  Q    (By Mr. Bryan)  Was there anything that would
2  trigger or require that you contact a reference or a
3  former employer?
4  A    Not specifically, no.
5  Q    Do you have in your mind or just part of your
6  practice any type of criteria that would cause you to
7  either contact a reference or a former employer?
8          MR. POE:  Object to the form.
9          Go ahead.
10         THE WITNESS:  Again, it would be on a
11 case-by-case basis.
12 Q    (By Mr. Bryan)  Is there anything that you
13 would rely on, on a case-by-case basis, that would
14 trigger you to make a call?
15 A    Without speaking hypothetically, possibly the
16 way someone left another agency.
17 Q    Explain that for me?
18 A    If I knew someone from here that left another
19 agency and applied here, I would probably contact that
20 agency to find out why.
21 Q    Why would you do that?
22 A    Because here I know everyone.
23 Q    Beyond knowing people, is there a public
24 safety reason associated with the reason why you might
25 call?

Dustin Bray                                                December 3, 2024

Page 48

1               MR. POE:  Object to the form.
2               Go ahead.
3               THE WITNESS:  That's possible.  But,
4    again, that's a case-by-case basis.
5        Q    (By Mr. Bryan)  When I say public safety
6    reason, what does that mean to you?
7        A    It could be you would have to find out the
8    reason someone's no longer employed there.
9        Q    Would you agree that law enforcement, if they
10   are not of good temperament, good judgment, can put the
11   safety of the public at risk?
12              MR. POE:  Object to form.
13              MR. KIM:  Object to form.
14              THE WITNESS:  That is possible.
15       Q    (By Mr. Bryan)  And would you agree that that
16   is one of the reasons you would want to explore
17   someone's prior employment history?
18              MR. POE:  Object to the form.
19              Go ahead.
20              THE WITNESS:  Again, that's possible, on
21   a case-by-case basis.
22       Q    (By Mr. Bryan)  Anything else that you can
23   think of that you use the employment application for in
24   the hiring process?
25       A    Not that I can think of.

Page 55

```
 1   you started in the position?
 2        A    As far as I know, yes.
 3        Q    You didn't come up with the contents, or
 4   anything like that?
 5        A    No.
 6        Q    But just in terms of how you used it as a
 7   tool, you would look at the last two questions as
 8   something that could weed out a bad candidate; is that
 9   fair?
10        A    A fair assessment, you should look through all
11   of it.
12        Q    Okay.  Any other ways you would use this
13   information in the questions section?
14        A    Looking at the personality of the officer.
15        Q    The same kind of questions, emergency contact,
16   military service, then the disclaimer and signature, are
17   you familiar with this document?
18        A    Yes.
19        Q    What are we looking at here?
20        A    That's the notice of employment from CLEET.
21        Q    Who is responsible for filling these out?
22        A    The officer and an administrator.
23        Q    On this particular one is that your signature
24   down at the bottom?
25        A    Yes.
```

1   **Q**   And that's in a box that says "Department
2   Administrator Attestation."  Do you see that?
3   **A**   Yes.
4   **Q**   Were you the department administrator?
5   **A**   Yeah.  Or the sheriff's designee, yes.
6   **Q**   Did anybody give you any type of training on
7   how to fill these out?
8   **A**   No.  It's just, they're self-explanatory.
9   **Q**   But just to be clear, nobody has told you on
10  how to fill these out?
11  **A**   No.
12  **Q**   CLEET has never given you any instruction on
13  how to do this?
14  **A**   No.
15  **Q**   The sheriff never gave you any instruction on
16  how to do this?
17  **A**   No.  If there's usually something wrong with
18  it, CLEET will advise you.  But, no, it's
19  self-explanatory.
20  **Q**   This question right here, it's Number 2, can
21  you see that?
22  **A**   Yes.
23  **Q**   How do you satisfy that criteria?
24  **A**   With a document from a psychologist.
25  **Q**   Is it your understanding any psychologist who

Page 57

1 is licensed is sufficient?
2     A    Yes.
3     Q    And where did you get that understanding?
4     A    That's been our understanding from CLEET the
5 whole time.
6     Q    Is there anybody at CLEET that's told you
7 that?
8     A    No.  But visiting with the sheriff, CLEET has
9 never objected to any other one.
10     Q    Is it fair to say that the practice of the
11 Push County Sheriff's Office at this time was that any
12 psychological -- passing psychological evaluation from a
13 psychologist was sufficient to satisfy this criteria?
14     MR. POE:  Object to the form.
15     Go ahead.
16     THE WITNESS:  I would say that's more of
17 a satisfaction with CLEET.  That's their requirement.
18     Q    (By Mr. Bryan)  What do you mean by that?
19     A    They require that you have a passing
20 psychological exam in your academy packet.
21     Q    And you are relying on CLEET to determine
22 whether it's compliant?
23     A    No.  We rely on the document, itself.
24     Q    Have you looked at 70 OS 3311?
25     A    Briefly, dealing with some other issues with

1  CLEET.
2       Q    Have you ever read the language in there that
3  discusses a passing psychological evaluation must be
4  completed by an Oklahoma licensed psychiatrist or
5  psychologist?
6       A    Yes.  For someone that's not CLEET certified,
7  or that's not a certified law enforcement officer.
8       Q    Do you believe that there's an exception for
9  people seeking reciprocity?
10      A    With our understanding with CLEET, yes;
11 because they have never required new MMPIs with
12 out-of-state certified officers.  That was a discussion
13 that I had with the sheriff.
14      Q    Have you ever spoken to anybody at CLEET about
15 that?
16      A    I haven't personally, no.
17      Q    Do you have any knowledge or information on
18 what CLEET does when they receive this notice of
19 employment?
20      A    Yeah.  They usually take that and add them to
21 our training roster.
22      Q    Do you know if CLEET assumes any
23 responsibility for verifying whether the psychological
24 evaluation is compliant with 70 OS 3311?
25      A    I can't testify to what CLEET does, no.