Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

```
DAN MILLER, AS SPECIAL          )
ADMINISTRATOR FOR THE ESTATE    )
OF HANK MILLER, DECEASED,       )
                                )
        Plaintiff,              )
                                )
vs.                             ) NO. 22-cv-164-RAW
                                )
                                )
B.J. HEDGECOCK, IN HIS          )
OFFICIAL CAPACITY AS SHERIFF    )
OF PUSHMATAHA COUNTY,           )
STATE OF OKLAHOMA, ET AL.,      )
                                )
        Defendants.             )
```

VIDEOCONFERENCE DEPOSITION OF
BYRON DALE "B.J." HEDGECOCK, JR.
TAKEN ON BEHALF OF THE PLAINTIFF
LOCATED IN MCALESTER, OKLAHOMA
ON OCTOBER 8, 2024

REPORTED BY:  JANA C. HAZELBAKER, CSR

**EXHIBIT 15**

BJ Hedgecock                                                October 8, 2024

Page 25

1   Q   Are there any other employees that are
2   allowed to make hiring or firing decisions without
3   consulting you?
4   A   On the hiring or firing, everybody will
5   consult me first.
6   Q   Gotcha. And in terms of assembling the
7   paperwork for you to make the decision about hiring
8   or firing, who has -- can people do that without
9   consulting you?
10  A   Yes. It would be the undersheriff and
11  Captain Goode.
12  Q   Okay. And they have final authority over
13  what to do in that regard?
14  A   Yes.
15  Q   Okay. And then you will take the
16  information that they compile and then you will make
17  a decision about what to do?
18  A   Yes, sir.
19  Q   Okay. What does your hiring process look
20  like?
21  A   Well, they'll go through their references
22  and their background and they'll visit with them.
23  Then they'll come to me and say whether they think
24  they're suitable to -- that they'd make us a good
25  road deputy or not.

BJ Hedgecock                                                    October 8, 2024

Page 26

1    Q    Okay.  And then what information is
2  available to you to make that decision?
3    A    Well, they'll give me the application and
4  what they -- and they'll sit in the office and
5  basically brief me and tell me exactly what they
6  think.  I respect their opinions.
7    Q    Got it.  Okay.  So basically the material
8  that they look at, they'll package it up and give it
9  to you so that you can look at it as well?
10   A    Yeah.  They'll build a personnel file.
11   Q    Okay.  Got it.  And are there any, like,
12  written guidelines or policies that provide any type
13  of guidance on what needs to be done when you're
14  assembling or creating a personnel file?
15        MR. POE:  Object to the form.  Time frame.
16        Go ahead.
17        THE WITNESS:  There is a process we have in
18  place now, but that time period we -- at this time,
19  when we first started office, no, there wasn't a
20  written-out schedule.
21   Q    (By Mr. Bryan) Okay.  But you say now there
22  is?
23   A    Yes, sir.
24   Q    Okay.  When did that change?
25   A    My undersheriff has been putting some more

1   Q   Okay.  Are you familiar with the
2   requirements involving a psychological evaluation to
3   be a peace officer in Oklahoma?
4   A   Yes.
5   Q   Do you have any written guidance or policy
6   that would require your agency to investigate the
7   adequacy of that certification when presented by
8   somebody that is seeking reciprocity?
9   A   We will submit it to C.L.E.E.T. and then
10  C.L.E.E.T. will tell us if they're eligible for
11  reciprocity or not.
12  Q   Okay.  So you will take the documents
13  received from the applicant, and then you will pass
14  that on to C.L.E.E.T. and then C.L.E.E.T. will make a
15  determination on eligibility?
16  A   The best I can understand -- because you
17  went blank there for a second.
18  Q   Oh, I'm sorry.
19  A   Can you repeat that because I didn't --
20  Q   Yeah.  Absolutely.  So I'm just trying to
21  repeat my understanding so that if it's wrong you can
22  say, no, that's not right.
23      Is it frozen on you or can you see me?
24  A   You freeze every now and then, so --
25  Q   Yeah.  Just let me know if it does freeze

1  and we can start again.
2         Yeah.  So what I was just trying to confirm
3  was -- so what happens is the applicant to your
4  agency submits the paperwork to you guys as part of
5  the hiring process, and then you will take that
6  documentation and provide it to C.L.E.E.T. and then
7  C.L.E.E.T. will make a determination as to the
8  eligibility of that applicant?
9       A    Yes, they'll tell us what they would
10 require to attend the academy and what they would
11 need.
12      Q    Okay.  So in the context of, like, the
13 psychological evaluation, if someone like Keith Knoll
14 had a psychological evaluation that was done in Texas
15 and he presents that to you as part of the hiring
16 process, do you do -- do you have any guidance or any
17 policies that would require your office or your staff
18 to determine if that certification is adequate under
19 Oklahoma law, or do you take that document and send
20 it to C.L.E.E.T. and have C.L.E.E.T. make that
21 determination?
22      A    I send it to C.L.E.E.T., sir.
23      Q    Okay.  And that's how your agency operated,
24 at least back at the time Mr. Knoll was hired,
25 correct?

1      A     Yes, sir.
2      Q     Okay.  Does it operate differently now?
3      A     Well, if they are not certified in another
4  state, then we will give them an MMPI.  But if
5  Oklahoma honors the other state, my understanding
6  from C.L.E.E.T. is then they'll send us a deal saying
7  they're eligible for reciprocity.
8      Q     Okay.  Got it.  Tell me a little bit
9  about -- just in terms of your office.  We talked a
10 little bit about kind of the hiring process.
11           Tell me your -- I guess what you would call
12 "onboarding."  How -- when you're bringing a new hire
13 on, how do you -- or what do you do, if anything, for
14 somebody who's going to be, you know, serving in the
15 role of, like, a patrol deputy?
16           MR. POE:  Object to the form.
17           THE WITNESS:  It depends on if they're
18 certified or not.
19     Q     (By Mr. Bryan) Okay.  Let's say they're not
20 certified, what do you do?
21     A     If they're not certified, they'll work with
22 somebody until we get them into the academy.  And if
23 they're not -- if they're not -- have done the job
24 before.  If they're -- if they're certified or
25 eligible for certification, they'll -- they'll learn

BJ Hedgecock								October 8, 2024

Page 59

1   persons?
2       A    Yes, sir.
3       Q    Did you listen to the audio recordings of
4   those interviews?
5       A    No, sir.
6       Q    Okay.  So if something was discussed in the
7   audio interview with the OSBI agent and was not
8   reflected in the written narrative, you wouldn't have
9   knowledge or information about that, correct?
10      A    Correct, sir.
11      Q    Do you ever listen -- I mean, I assume this
12  is not the first OSBI report that you have received?
13      A    First officer-involved shooting I've had.
14      Q    Yeah, fair enough, but I -- OSBI
15  investigates a lot of things and I -- as a sheriff
16  since 2017, I assume that you've looked at more than
17  one OSBI report?
18      A    Yes, on homicides and stuff they work.
19      Q    When you receive those materials from the
20  OSBI and they have the narrative summary of the
21  interview, do you ever go back and listen to the
22  audio?
23      A    No, sir.
24      Q    Why not?
25      A    Because when I get a report on it, it's

```
 1        Q    So that would not have factored into your
 2   hiring decision?
 3        A    No.
 4             MR. BRYAN:  Okay.  I'll introduce Knoll's
 5   employment application as Exhibit Number 1.
 6             (Whereupon, Exhibit Number 2 was marked for
 7   identification purposes and made a part of the
 8   record.)
 9        Q    (By Mr. Bryan) All right.  Sheriff, can you
10   see my screen here?
11        A    Barely.  Pretty blurry.
12        Q    Is that better?
13        A    Can you go just a little bit further, sir?
14             All right.  Thank you, sir.  I can see it
15   there.
16        Q    Okay.  Have you seen this document before?
17        A    That's a -- like a Texas MMPI.
18        Q    Okay.  This is the Licensee Psychological
19   and Emotional Health Declaration that Keith Knoll
20   submitted to your agency.
21             Do you have any reason to disagree with
22   that?
23        A    I don't have a -- I wouldn't -- I mean, it
24   would be -- he would need that to attend C.L.E.E.T.,
25   yes.
```

```
                                                      Page 82
 1        Q    And you understand that the psychological
 2   evaluation must be completed by an Oklahoma licensed
 3   psychologist, right?
 4        A    They --
 5             MR. POE:  Object to the form.
 6             Go ahead.
 7             THE WITNESS:  I'm sorry.
 8             MR. POE:  Go ahead.
 9             THE WITNESS:  They have never told me that.
10   I've hired people from Virginia to everywhere else.
11   C.L.E.E.T. has never told me that.
12        Q    (By Mr. Bryan) But when you read the
13   statutory language, that's exactly what it says, is
14   it not?
15        A    Yes, but they --
16             MR. POE:  Object -- oh, go ahead.  Go
17   ahead.
18             THE WITNESS:  Sorry.
19             MR. POE:  Go ahead.  You're good.
20             THE WITNESS:  Yes, but they -- they accept
21   them every time.
22        Q    (By Mr. Bryan) Okay.  And C.L.E.E.T. has
23   never not accepted those, right?
24        A    They've never had no problem with them.
25   I've hired people from -- when I worked for the drug
```

Page 83

1  task force we hired people that's transferred over
2  from TECOLE.
3           I hired one from Virginia Beach that
4  Oklahoma honored.
5           And some states they don't honor, like
6  Kansas.
7       Q   Okay.  And have they ever told you -- other
8  than just accepting them, have they ever told you,
9  that, hey, if somebody's coming on from Texas, they
10 don't need to have an Oklahoma licensed psychologist
11 do their --
12      A   They have never -- to this day they have
13 never told me nothing about --
14      Q   Got it.  Okay.
15      A   Let's just send me a letter saying they're
16 acceptable for reciprocity after you send the stuff
17 to them and give you a date for them to be at the
18 academy.
19      Q   Say that again.  They send you a letter
20 that says what?
21      A   Well, letter or email.  Used to be letters,
22 but everything since COVID is email now.  And telling
23 you the dates that they've been accepted and the
24 dates they'll go to the academy.
25      Q   Okay.

```
 1      A    With TECOLE, its reciprocity is only legal
 2  block.  They don't have to go through nothing else.
 3  Oklahoma and Texas honor, so -- their training.
 4      Q    Right.  But no one's ever told you that the
 5  psychological evaluation is not required?
 6      A    Say that again.
 7      Q    No one's ever told you that a psychological
 8  evaluation by an Oklahoma licensed psychologist is
 9  not required?
10      A    No, they never told me either way.  They
11  told me -- I've always been under the impression this
12  was acceptable to use.
13      Q    And that belief was based upon C.L.E.E.T.
14  just accepting the notice of employment that you guys
15  send to them?
16      A    Yes.  I mean, they usually correct us on
17  anything else that they need done, so, I mean --
18      Q    Okay.  Fair enough.
19           MR. BRYAN:  I'll introduce that Texas
20  psychological evaluation as Exhibit 2.
21           (Whereupon, Exhibit Number 3 was marked for
22  identification purposes and made a part of the
23  record.)
24      Q    (By Mr. Bryan) All right.  Can you see my
25  screen here?
```